PEOPLE *v.* HORLING.

FISH—INLAND LAKES—PRIVATE OWNERSHIP—RIGHTS OF OWNER—
FISHING REGULATIONS—STATUTES—APPLICATION.

Where a lake is so situated that fish from a river migrate to and from it at different periods of the year, the fact that it is wholly located on defendant's land, which he has posted, and that he himself has stocked the lake with fish acquired from private sources, does not deprive the public of its right to take fish therefrom, nor entitle him to take fish therefrom by means other than a hook and line, in violation of 2 Comp. Laws, § 5849.[1]

Exceptions before judgment from Ottawa; Padgham, J. Submitted April 21, 1904. (Docket No. 190.) Decided July 27, 1904.

[1] As to right to fish, see note to *State* v. *Shaw*, (Ohio) 60 L. R. A. 481.

John W. Horling, Bert Horling, and John Horling were convicted of illegal fishing.    Affirmed.

*Smedley & Corwin,* for appellants.

*Charles A. Blair,* Attorney General, and *Henry E. Chase,* Deputy Attorney General ( *W. I. Lillie,* of counsel ), for the people.

MOORE, C. J.    The respondents were convicted of violating the provisions of section 5849, 2 Comp. Laws, which reads:

"That it shall not be lawful for any person to take, catch, or kill, or attempt to take, catch, or kill, any fish in any of the inland lakes in this State with any kind of spear, or grap hook or by the use of jacks or artificial light of any kind, or by the use of set lines or night lines, or any kind of net, or any kind of fire-arms or explosive or other device, except the hook and line."

The accompanying plat will help to understand the situation (p. 408).

The testimony on the part of the people was in part as follows:    That at the time of the fishing alleged in the complaint, witnesses for the people testified that they went up the drain marked on the plat, with a boat, into said lake or bayou, and found the nets respondents were fishing with that night; that said respondents, or some of them, put a wire netting in said drain, reaching from the bottom thereof to above the top thereof, and that the respondents, or some of them, admitted that they put this screen in said drain to keep fish from going up and down said drain and into or out of said lake or bayou; that the length of time water runs in and out of said lake through said drain depends upon the length of time the water is high enough to get in and out, but in every year there is always more or less time that fish can go in and out of said lake; that most of the fish planted in said lake or bayou, except carp and bass, have been taken from holes or pools in the lowland surrounding said lake or bayou

after the high water receded and left the lowlands comparatively dry; that in the spring freshets, when Grand river rises and overflows its banks, then said bayou is

connected with Grand river, so that fishes can come and go to and from Grand river; that this connection exists as long as the high water exists; that some four years ago a public drain was laid by the drain commissioner; this drain does not follow any old outlet, but takes a westerly course, and strikes Grand river farther down, where the cut in the river bank is located, so that after the river lowers, and there is no connection between the river and the bayou through this cut in the bank, the water still continues to run out of the bayou or lake, through this ditch, into the river; that after the ditch was dug it lowered the lake some two feet, and drained considerable land surrounding the lake; that fishes can come and go through this ditch for part of the year, as it does not become dry as soon as the old inlet or cut in the river bank. That some of the witnesses for the people testified that there were both spring and fall freshets, and that from three to five months of the year, during the spring and fall freshets and natural high water, fish could go in and out of said lake and bayou; that some of the witnesses claimed that there were freshets in July and August, in which water was high enough so that fish could go in and out of said lake or bayou.

On the part of the defendants, they offered evidence tending to show that since 1851 the defendant John W. Horling has been the owner and in possession of the land upon which this bayou or lake is situate; that he owns all the land around said lake or bayou, and that the same is not a meandered lake; that over 15 years ago he put up notices, painted wooden signs, and nailed them on the trees in the vicinity of the lake, telling the public that it was private property, and that no fishing was allowed in said lake or bayou, and that said signs have ever since been kept up to notify the public; that the bank of the river very seldom overflows, but once a year the river would get high enough so that the water would flow into the old inlet, which would last sometimes 15 days; the water would subside in the river, then the river would be

entirely shut off, and the bayou or lake would have no connection with any public waters until the next spring freshet came; that there is no water in the ditch to exceed 20 to 25 days in any one year; the rest of the time the bayou or lake is entirely disconnected from any other waters; that there is no inlet to said lake; that the inlet from the river has no defined channel, except where it breaks through the high bank near the river; that this is dry so much of the time that it is overgrown with tame grass, and becomes good pasture land; that during the last 30 years the owner of the land has piped and tiled cold spring water from the adjoining land down to this lake, and during all these years has planted little fishes in said lake, obtained from surrounding pools of water, such as carp, bass, sunfish, and pickerel; that on account of the planting of these fish (not obtained from any public fish hatchery) this bayou or lake has become well stocked with fish, so that the fishing is much better than in Grand river, and people resorted there to fish to such an extent that it became necessary, and the owner of the land put up signs forbidding trespassing, and notifying the public that it was a private lake, and that fishing was not allowed; that on the day alleged in the complaint and warrant the respondents were fishing with a net, which they claimed they had a right to do, as it was private property; they set these nets near the place where the cold-water pipes and tile made the water fresh, and where the fishes were in the habit of frequenting to get cool water.

Among other things, the judge charged the jury:

"If you should find in this case from all the evidence in the case, that this lake is so connected with Grand river, or with any other body of water that is public, so that fish can go from public waters into this water or into these waters, if they can go there at any time of the year during freshets, or if the fact is that Grand river fish can get into this lake and out again, no matter whether they come out the same day, or the next week, or the next season, if they can go into this lake, and have a free passage in and out again into the public waters, under those

circumstances your verdict should be ' Guilty ' in this case, because, as I instruct you, that would make this one of the inland lakes coming within the description under this statute; that it is not necessary that any particular length of time should exist during the year in which this body of water is connected with Grand river, or any other public body; it is not necessary that any particular time should exist. If you find that the fish can migrate from a public body of water (which it is admitted Grand river would be) into this lake, and can go back again (in other words, if they have free access in and out), the length of time during the year cuts no particular figure, but, of course, unless that should be the fact, they would not be guilty. If fish cannot get into this lake at all from any outside waters, and it has no connection at any time of year with any other body of water, the contention of these respondents would be correct."

It is insisted this charge is error; that respondents owned the land around and under the lake, the water of the lake, and the fish therein; and that the statute does not apply to such a case.

This statute has been before the court a number of times, though the exact question presented here has not been passed upon. There is a great diversity in the laws of the various States and the various countries in relation to what constitutes navigable waters and to the rights of riparian owners. As early as *Thunder Bay River Booming Co.* v. *Speechly*, 31 Mich. 336 (18 Am. Rep. 184), it was contended there can be no such thing as a navigable stream in which the public have rights, which is only open to the public use periodically; but it was held, as was held as early as *Moore* v. *Sanborne*, 2 Mich. 519 (59 Am. Dec. 209), that this was not so, but that such a stream is a public highway by nature, but one which is such only periodically, and while the natural condition permits a public use, during which time the public right and the private right of the riparian proprietors must each be exercised with due consideration for the others. In *Lincoln* v. *Davis*, 53 Mich. 375 (19 N. W. 103, 51 Am. Rep. 116), there is an interesting discussion of the status

of fishes and the right to take them, in which it is declared they are feræ naturæ, and can be taken by any one who has the right to be on the premises, unless forbidden by the statute. Notice is taken of the fact that the State has taken the subject under its control. In *People* v. *Collison*, 85 Mich. 105 (48 N. W. 292), the respondent was convicted under a similar statute to this one. His defense was that "he was fishing upon his land, over his own soil, and in his own water," and that the statute, so far as it undertook to interfere with his right to do so, was invalid, and unconstitutional, because it deprived him of his property without compensation. In disposing of the case Justice McGRATH, speaking for the court, said:

"It does not appear here that the land of James Collison extends into the lake, but, in our view of the case, that is entirely immaterial, as the rule would be the same whether he did or did not own the land over which the fish were caught. It is sufficient that he did not own Gun Lake, and, even though he did, that it connected with other lakes and streams through which fish migrate. The right of James Collison to fish in Gun Lake is not an exclusive right, and the design of the statute is to protect others in Gun Lake, as well as in the other waters connecting therewith, in the enjoyment of the same privilege. The right to fish even in these waters is so far public that the State may by statute protect it. The protection of fish in Gun Lake is necessary for their preservation in the waters of Pan Lake, Gun river, the Kalamazoo river, Lake Michigan, and the other Great Lakes. Defendant, James Collison, never acquired any property in the fish which frequent Gun Lake. By reason of their migratory habits, their ownership is in the whole people of the State, and no individual has any property right in them until they have been subjected to his control. To fish is a privilege accorded by the State, and the question of individual enjoyment is one of public privilege, and not of private right. 'Unless the catching of fish,' as is said by one writer, 'is conducted with reason, either the fish may be altogether exterminated, or the enjoyment of the right by one may interfere with the equal enjoyment of the right by others.' Hence, for the protection of fish, a valuable article of food and merchandise, the control of which is

in the State, and to preserve equality in the right to fish, the State has an undoubted right to regulate the manner in which they shall be caught, and to protect their migrations. There was no error in the refusal of the court to direct a verdict for defendants."

In *People* v. *Conrad*, 125 Mich. 1 (83 N. W. 1012), the complaint was made under the same section of the statute involved here. In that case there was neither inlet nor outlet connecting the lake with other waters, and, while it was held that the respondents were improperly convicted, the court said:

"If it [the lake] were connected with other lakes and streams, so that fish might pass in and out of it, others than the owners would then have an interest in the protection of the fish in the lake."

The case of *People* v. *Bridges*, 142 Ill. 30 (31 N. E. 115, 16 L. R. A. 684), is an instructive case, though the Illinois statute, as stated by counsel for respondent, is much broader than the title of the act involved here. The opinion, among other things, states:

"It is said that Miller's rights in said body of water are so paramount and exclusive that, if he chose to fill it up, and thereby destroy it as a lake or pond, no rights of any private party or of the public would be infringed. And this is put forward as the test of the legislative intention to include said lake among the waters enumerated by said act. It seems to us to be a sufficient answer to this contention that the statute itself neither expressly nor by implication has established any such test. There may be and doubtless are various, and perhaps many, lakes, ponds, sloughs, and bayous in the State which are so far private property that the owner may drain them, or fill them up without infringing any public or private right, but which, so long as they are permitted to remain in their natural condition, are places where fish common to the waters of the State are propagated and raised. And, while this is so, the statute makes no distinction between bodies of water thus situated and those in respect to which public rights or private easements exist. Its language applies to all alike.   *   *   *   Indeed, the power to protect and preserve the fish in the waters of the State would be

practically nugatory, if, as is contended, it was confined to streams and watercourses, and was excluded in case of all bodies of water which were so far subject to private ownership that the owners would have a right to drain them or fill them up, and thus destroy them as bodies of water.   *   *   *   While said body of water has no continuous connection with the river, situated but a few yards away, such connection is established during all periods of high water, and continues for a sufficient length of time to allow fish to pass into it, or the fish in the lake to escape therefrom.   During such periods of high water, which occur once or twice, if not oftener, every year, and continue sometimes for several weeks, said lake, so far as the passage of fish to and from it is concerned, becomes, for all practical purposes, a part of the river.   During these periods, as we may presume, migratory fish passing up the river in search of proper places for depositing spawn are liable for such purpose to pass into this, as into other, bayous where the waters are quiet, but with this difference: That while, in case of ordinary bayous, which maintain their connection with the stream, the fish, after accomplishing their purpose, are at liberty to leave, and go elsewhere, here, by the receding of the water, their exit is for the time being cut off, and they, as well as their progeny, are compelled to remain.   As soon, however, as another flood occurs—a thing which may happen at any season of the year—the fish thus impounded are at liberty to escape, and, if they do so, any qualified property the owner of the lake may have in them is at once divested. We are unable to see how the mere fact that said lake, instead of having a continual connection with the river, has such connection only during periods of high water, can have any essential bearing upon the rights which the owner of the soil has in the fish that happen for the time being to be in the lake.   *   *   *   It is impossible, therefore, to distinguish the present case from those arising in relation to other waters in the State to which the statute is applicable.   The public interest is involved in both in the same way, if not to the same extent, and the public interest in both is such as to justify legislative interposition."

The court may take notice of the fact that fish are an important food product, and that the State as a whole is interested in having the supply increase, instead of de-

crease.   So important is this thought tó be, that large sums of money, raised by taxation, are expended by the State, under the direction of a commission, in the propagation and distribution of fish.   Along similar lines laws are enacted for the protection of the fish, making certain methods of taking them unlawful.   The facts disclosed by this record show that during the various overflows of Grand river a very large proportion of the fish found in this lake came to it from Grand river.   Fish would naturally go there from Grand river in the spring for spawning purposes, and later, when the spawn was hatched and became fish of some size, during periods of high water they would find their way into Grand river.   We do not think it can be said the public has no interest in this lake and in the fish therein.

The conviction is affirmed.

CARPENTER, MONTGOMERY, and HOOKER, JJ., concurred.   GRANT, J., did not sit.