PORT OF SEATTLE *v.* OREGON & WASHINGTON RAILROAD COMPANY ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WASHINGTON.

No. 107. Argued December 6, 1920.—Decided January 31, 1921.

1. The navigable waters in Washington, and the lands under them, passed to the State, upon its creation, in full proprietary ownership, subject to the federal control over navigation. P. 63.

2. In conveying tide lands, the State is free to grant them with rights

in the adjoining water area, or to withhold such rights completely; the effect of the conveyance in this regard is determined by the local law.  P. 63.

3. Under the Washington law, a grantee from the State of uplands on a natural, navigable waterway, takes only to high-water mark, without riparian or littoral rights.  P. 64.

4. So, too, a grant by the State of a described parcel of tide land, conveys no rights in or over adjoining tide land or water, these being withheld in order that the State may not be hampered in developing waterways and harbors in the public interest.  P. 65.

5. The same rule applies to a conveyance of tide lands reclaimed by the State by filling, and abutting on a natural waterway confined by such reclamation and deepened by dredging.  P. 67.

6. The State of Washington, through the Port of Seattle, filled in a large area of tide land up to bulkheads confining a waterway; dredged a channel in the waterway leaving shoals on either side of it; divided the land into numbered blocks and lots, and conveyed lots abutting on the waterway by a deed describing them by their numbers, without mention of the waterway or of water rights, but referring to a plat on which the boundaries of the lots were set forth, with lineal measurements, and on which the waterway was also shown, and within it, on each side and some distance from the bulkheads, a line marked "Pierhead Line."  *Held:* (1) That, in view of the policy of the State to retain control over navigable waters, an intention to convey with the lots a right to wharf out to the line and thus gain access to the fairway, could not be implied, even assuming that there was no law at the time under which permission to do so could be granted by the state harbor commissioners.  (2) That the establishment of the pierhead line by the United States did not create a right to wharf-out, as against the State; and, *semble,* under the state law, its presence on a plat had no other effect than as a publication of the federal action.  P. 67.

7. A municipal corporation of a State is a citizen of that State, within the rules governing removal of causes to the District Court.  P. 70.

8. The right to remove a suit brought by a municipality to quiet the title of the State to a navigable waterway against an abutting land owner claiming a right to wharf out, cannot be denied on the ground that the State is the real party in interest, where the municipality has an independent financial interest in the controversy.  *Id.*

Reversed.

THE case is stated in the opinion.

*Mr. Leander T. Turner*, with whom *Mr. Harold Preston* and *Mr. O. B. Thorgrimson* were on the briefs, for appellant.

· *Mr. W. H. Bogle*, with whom *Mr. F. T. Merritt* and *Mr. Lawrence Bogle* were on the brief, for appellees.

·MR. JUSTICE BRANDEIS delivered the opinion of the court.

The main question in this case is whether the Oregon & Washington Railroad Company acquired, as owner of land adjoining East Waterway in the Port of Seattle, the right to build in the waterway piers, wharves and other structures over which it would secure access from its land to the navigable channel. The question arises in a suit to quiet the title of the State which was brought against the Railroad in a state court of Washington, in 1917, by the Port, a municipal corporation,[1] created by the laws of Washington. J. F. Duthie & Co., lessees of the Railroad's land, were joined as defendants; but they have no substantial interest in the controversy; and their peculiar rights do not require consideration. The case

---

[1] C. 92, of the Laws of 1911, p. 412, as amended by Laws of 1913, c. 62, p. 202. It has power, among other things, to improve navigable and non-navigable waters of the United States and of the State within the port district; "to create and improve for harbor purposes new waterways within the port district; to regulate and control all such waters within the limits of such port district so far and to the full extent that this state can and hereby does grant the same, and remove obstructions therefrom; to straighten, widen, deepen and otherwise improve any and all waters; . . . ⁻ to execute leases of all lands, wharves, docks and property owned and controlled by said port district upon such terms as the port commission may deem proper." It exercises also powers similar to those exercised by counties including the power to sue and be sued. *State* v. *Bridges*, 87 Wash. 260. The State did not transfer to the port districts its ownership in the beds and shores of navigable waters.

was removed to the District Court of the United States by petition of the Railroad which is an Oregon corporation; and a motion to remand was denied. Upon full hearing on the merits a decree was rendered dismissing the bill. The case comes here by direct appeal of the Port under § 238 of the Judicial Code, it having been contended by the Railroad and held by the lower court that the validity of c. 168 of the Laws of Washington of 1913, p. 582, is involved, and that its provisions violate the contract clause and the due process clause of the Federal Constitution. The following facts are material:

When the State of Washington was admitted into the Union there lay in front of the City of Seattle extensive tide lands in the area now comprised within the limits of the municipal corporation known as Port of Seattle. Under appropriate legislation of the State this area has been developed as a port. Waterways have been established and in part dredged; tide lands abutting upon the waterways have been filled, platted as city blocks and laid out with streets; and lots therein have been sold for business and other purposes. Among the waterways so established is that known as East Waterway, which connects Duwamish River with Elliott Bay, an arm of Puget Sound. East Waterway, as established, has at the point in question, a width of 1,000 feet. The bed of the waterway was in its natural state tide land. The 750 feet of the waterway which lie in the centre have been dredged to a depth at mean low tide of from 26 to 30 feet. The rest of the waterway, being that portion which extends on either side for a distance of 125 feet from the bulkhead of the filled land to the fairway, is of varying depth and is not navigable by large vessels. The bed of the waterway within these 125 feet areas slopes from the bulkhead to the line of the fairway. It is exposed at low tide ordinarily at points about thirty-six feet from the bulkhead.

The Railroad's parcel here in question is filled land adjoining the west side of this waterway. The tract is a part of Block 393, Seattle Tide Lands, shown on a plat duly filed with the County Auditor in 1895, and was acquired from the State by the Railroad's predecessors in title prior to 1907. The deeds by which the State conveyed the land do not in words purport to grant any right in the waterway; nor is mention made of East Waterway either in the granting clause or elsewhere in the deed.[1] On the plat, by which the land was sold, the boundaries of the block, and of the several lots comprised within it, are set forth clearly and lineal measurements are given. East Waterway is shown on the plat and, on each side of the waterway, a broken line called "Pierhead line," is marked at a distance of 250 feet from the bulkhead. It is alleged by the Railroad that this pierhead line, established by the War Department as prescribing the limits beyond which structures obstructing navigation would not be permitted in the waterway, had been adopted also by the state authorities. In 1914, by joint action of the War Department and of the state authorities,

---

[1] The form of the deed is as follows:

First party does hereby grant, bargain, sell and convey unto the second party, and to his heirs and assigns, the following described tide lands of the first class, situated in front of the City of Seattle, King County, Washington, to-wit:

Lots one to nine, inclusive, block 393, as shown on the official map of Seattle Tide Lands, filed with the Board of State Land Commissioners at Olympia, Washington, March 15, 1895.

Subject, however, to any lien or liens that may arise or be created in consequence of an act of the Legislature of the State of Washington, entitled "An Act prescribing the ways in which waterways for the uses of navigation may be excavated by private contract; providing for liens upon tide and shore lands belonging to the State, granting rights of way across lands belonging to the State," approved March 9, 1893.

Witness the seal of the state affixed.       HENRY McBRIDE,
                                        *Governor.*

and with the assent of abutting owners, the pierhead line was moved back to a point 125 feet from the bulkhead, leaving the fairway in the centre 750 feet, as above stated, instead of 500 feet as originally indicated on the plat. The rights claimed by the Railroad are limited to this 125-feet area.

Chapter 168 of the Laws of Washington 1913, p. 582, provides that:

"Whenever, in any waterways created under the laws of the State of Washington, the government of the United States shall have established pierhead lines in said waterway at any distance from the boundaries thereof established by the state, no structure shall be allowed in the strip of waterway between the boundary and the nearest pierhead line except by the consent of the state land commissioner and upon plans approved and terms and conditions fixed by him, and then only for such period of use as shall be designated by him, but any permit shall not extend for a longer period than thirty (30) years: *Provided, however,* That the owner of land abutting upon either side of any such waterway shall have the right, if application be made therefor within a period of ninety (90) days following the date when this act shall go into effect, to obtain . . . " a permit authorizing the improvement and use of such area under conditions to be prescribed by the state authorities upon the payment of an annual rental dependent in amount upon the assessed value of an equal area of the abutting land.

The Railroad failed to apply for such a permit. Asserting the rights above stated, it leased a part of its land to J. F. Duthie & Co. for a shipbuilding and manufacturing plant, and purported to authorize the construction of wharves, piers and other structures upon the adjoining water area up to the 125-foot pierhead line. By the Act of 1913 the control over the waterways therein conferred upon land commissioners is to be exercised in port dis-

tricts by the port commissioners.  This bill to enjoin such
use of the waterway by the Railroad and its lessees and
to quiet title was, therefore, brought by the Port of
Seattle.

The decree entered by the lower court declared in sub-
stance (1) that the State has no proprietary interest in
the water area between the bulkhead and the pierhead
line; (2) that it is not entitled to lease the same or other-
wise to deprive the Railroad of access to the fairway; (3)
that c. 168 of the laws of 1913 in so far as it provides for
such leasing violates the Federal Constitution; (4) that
the Railroad has no proprietary interest in the waterway,
but as owner of the abutting lots is entitled to access to
the deep or navigable waters "subject to proper gov-
ernmental supervision."  The decree declared further
that the State had never established harbor lines in the
waterway, and expressly recited that the court does not
determine whether or not the State now has power to
establish harbor lines, nor what the effect might be of
hereafter establishing them.

The main question presented for our decision is whether
the Railroad acquired, in connection with the lots of filled
land abutting on the waterway, a private riparian or
littoral right to construct wharves, docks and piers on
this 125-feet area, in order to provide for itself, as owner
of the land, and for those claiming under it, convenient
access to the fairway for purposes of navigation and com-
merce.  The Port contends that the Railroad acquired
no such right, nor any private right whatsoever, in any
part of the adjoining waterway; and that the State is free
either to use this portion of East Waterway directly for
purposes of navigation, as the present fairway is used,
or to use it as a part of the harbor; and that, since it is
also the proprietor of the tide land, under this water
area, it has the full right to develop it, or authorize its
development by others, through the erection of wharves,

piers, docks or other structures in aid of navigation and commerce; and to charge a rental for the privilege.

*First.* The right of the United States in the navigable waters within the several States is limited to the control thereof for purposes of navigation. Subject to that right Washington became, upon its organization as a State, the owner of the navigable waters within its boundaries and of the land under the same. *Weber v. Board of Harbor Commissioners,* 18 Wall. 57. By § 1 of Article XVII of its constitution the State asserted its ownership in the bed and shore "up to and including the line of ordinary high tide in waters where the tide ebbs and flows." The extent of the State's ownership of the land is more accurately defined by the decisions of the highest court, as being the land below highwater mark or the meander line, whichever of these lines is the lower.[1] The character of the State's ownership in the land and in the waters is the full proprietary right. The State, being the absolute owner of the tide lands and of the waters over them, is free in conveying tide lands either to grant with them rights in the adjoining water area or to completely withhold all such rights. Whether a conveyance made by the State of land abutting upon navigable water does confer upon the grantee any right or interest in those waters or in the land under the same, is a matter wholly of local law. *Shively v. Bowlby,* 152 U. S. 1. Upon such questions the provisions of the constitution and statutes of the State and the decisions of its highest court are accepted by us as conclusive. *St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners,* 168 U. S. 349. The precise question presented here is whether the

---

[1] See *Scurry v. Jones,* 4 Wash. 468; *Cogswell v. Forrest,* 14 Wash. 1; *Washougal & La Camas Transportation Co. v. Dalles, Portland & Astoria Navigation Co.,* 27 Wash. 490; *Johnson v. Brown,* 33 Wash. 588; *Van Siclen v. Muir,* 46 Wash. 38, 40; *Brace & Hergert Mill Co. v. State,* 49 Wash. 326, 331.

State by executing the deed of the land, which in fact adjoined East Waterway, conveyed rights in that waterway. That question is, in essence, one of construction of the deed taken in connection with the plat therein referred to.

*Second.* Under the law of Washington (which differs in this respect from the law generally prevailing elsewhere) a conveyance by the State of uplands abutting upon a natural navigable waterway grants no right of any kind either in land below highwater mark, *Eisenbach* v. *Hatfield,* 2 Washington, 236; or in, to, or over the water, *Van Siclen* v. *Muir,* 46 Washington, 38, 41; except the limited preferential right conferred by statute upon the owner of the upland, to purchase the shoreland, if the State concludes to sell the same. Act of March 26, 1890, §§ 11 and 12, Laws of Washington 1889–1890, p. 505. The grantee of the upland cannot complain of another who erects a structure below highwater mark, *Muir* v. *Johnson,* 49 Washington, 66. He does not acquire any right of access over the intervening land and water area to the navigable channel, *Lownsdale* v. *Grays Harbor Boom Co.,* 54 Washington, 542, 550, 551. So complete is the absence of riparian or littoral rights that the State may—subject to the superior rights of the United States —wholly divert a navigable stream, sell the river bed and yet have impaired in so doing no right of the upland owners whose land is thereby separated from all contact with the water. *Newell* v. *Loeb,* 77 Washington, 182, 193– 194; *Hill* v. *Newell,* 86 Washington, 227, 228.[1]

---

[1] In some States the shore between the high and the low water mark belongs to the private owner of the upland and as such owner he has all rights not inconsistent with the public's rights incident to navigation. In other States, although the land below high water mark belongs to the State, the private owner of the upland has the right of access over it to the navigable channel and the right to use the State's land in connection therewith. See 27 R. C. L., §§ 273–279, 284. But, in

*Third.* The Railroad admits that such are the rights of a grantee from the State, where it is the upland which is conveyed. But it contends that a different rule applies where the sale is of tide lands. No basis for the distinction can be found either in the decisions of the highest court of the State or in reason. Since the upland owner has been denied riparian rights in deference to the asserted right of the State to control unhampered the course and development of navigable waters, the State's right must be superior also to the claim of the tide-land owner. For the assertion of title in the State was obviously made in order that it might not be hampered in developing waterways and harbors in the manner and to the extent that the public interest should from time to time demand. Such development obviously includes harbor facilities, like piers, docks and wharves, as well as adequate channels. Compare *State* v. *Bridges,* 87 Washington, 260. The proprietary right of the State over navigable waters and of the soil thereunder is neither exhausted nor impaired by making a sale of a tract of tide land, be it the parcel nearest the upland or some other. The State may in one year fill and sell the hundred feet of tide lands nearest the upland and in the next year fill and sell the parcel beyond.

---

Washington, it is "uniformly held that there is no riparian right in the owner of lands bordering on the navigable waters of the state," and that the State retains the proprietary right to the soil below high water mark. *State* v. *Sturtevant,* 76 Wash. 158, 163; *Brace & Hergert Mill Co.* v. *State,* 49 Wash. 326, 331. The language of some earlier cases, apparently in conflict with these views, was explained in *Hulet* v. *Wishkah Boom Co.,* 54 Wash. 510, 517. The cases referred to go no further than to hold that the owner of uplands has a right, in common with the public to use the stream for navigation, as it flows past his land; and that others conducting operations upon the river may not wilfully or negligently destroy his upland. *Dawson* v. *McMillan,* 34 Wash. 269; *Monroe Mill Co.* v. *Menzel,* 35 Wash. 487; *Burrows* v. *Grays Harbor Boom Co.,* 44 Wash. 630; see also *Judson* v. *Tide Water Lumber Co.,* 51 Wash. 164.

Compare *State* v. *Scott*, 89 Washington, 63, 70, 72. Or it may sell first the parcel more remote from the upland and later the one immediately adjoining it, or any other. In every case it may, in conveying the tide land, either grant or withhold rights in the water or in the water area, as it sees fit. When land washed by the ebb and flow of the tide is conveyed by the State with clearly defined boundaries, no rights of any kind beyond those boundaries ordinarily pass under the deed. *Pearl Oyster Co.* v. *Heuston*, 57 Washington, 533. Where a tide land owner acquires rights of access to deep water it is by arrangement with the owner of the intervening land. Compare *Pioneer Sand & Gravel Co.* v. *Seattle Construction & Dry Dock Co.*, 102 Washington, 608.

The cases most strongly relied upon by the Railroad do not relate to tide lands. They deal with the rights of shoreland owners on an inland lake, the level of which had been lowered by the Government. *State* v. *Sturtevant*, 76 Washington, 158; *Puget Mill Co.* v. *State*, 93 Washington, 128. Shore lands differ from tide lands not only in their situation, which in many cases makes an almost indefinite filling in of the latter a possibility, but also in legal definition. Tide lands have a definite boundary at the line of mean low tide; or, by later legislation, of extreme low tide. *State* v. *Scott*, *supra*, pp. 68, 69. The shore lands, on the other hand, were those "below the line of ordinary high water and not subject to tidal flow." They had no defined outer boundary. Accordingly when the waters of the lake there in question were lowered, it became necessary to determine the ownership both of the lands exposed and those below the new line of ordinary high water. The court held that the outer boundary of the shore land was the line of navigability and that grantees were entitled to follow that line out when it was moved by act of their grantor. The considerations which brought the court to this result were, it is true, largely the

same which in other jurisdictions led to the recognition of riparian rights, that is, the claim of the shore land owner to access to deep water. But the court did not secure this interest to the shore land owner by granting him extraterritorial rights—*i. e.* riparian or littoral rights. It did so by construing the outer boundary of his land to be the line of navigability; holding that since the legislature had not limited the outer boundary of shore lands, as it had done in the case of tide lands, it must have intended that the shore lands granted should extend to the line of navigable water, in the absence of legislation to the contrary. Compare *Bilger* v. *State,* 63 Washington, 457. The legislature confirmed this boundary, expressly restricting it to the lands to which the court had applied it; that is shore lands not within city limits. This doctrine can have no application to shore lands where the property line is fixed in the deed. And it cannot apply to tide lands, the dissimilarity of which to shore lands furnished the ground for enunciating the rule.

It appears, therefore, that the law of Washington does not recognize as appurtenant to upland, tide land or shore land in its natural condition, rights of any sort beyond the boundaries of the property. A right of access to the navigable channel over intervening land, above or below low water, must arise from a grant by the owner of the intervening property.

*Fourth.* The Railroad contends that a different rule should be applied here where we are dealing with made land abutting on an artificial waterway. East Waterway is not properly described as such. It is a natural waterway deepened and confined. Compare *Fox River Flour & Paper Co.* v. *Kelley,* 70 Wisconsin, 287, 300. And obviously the mere fact that tide land conveyed has been filled would not, by the law of Washington, confer upon the grantee, as appurtenant to the land, riparian rights in adjoining navigable waters. But the Railroad insists

that even if the right of access to the navigable channel is not appurtenant to its land as a matter of riparian law, its predecessor in title received the right by implied grant from the State. The right, it says, "depends in the last analysis upon a proper construction of the grant by the State of the abutting lots" in the light of all the circumstances. Among the most important of those, is the fact that the whole development project was an artificial creation, Land, it is urged, was artificially made up to a bulkhead. At some distance beyond a navigable channel was artificially created out of an unnavigable stream. Between the bulkhead and the channel are shoals which prevent full use of waterside lots in connection with navigation unless wharves are erected. When the original grant was made no provision in the law authorized leasing these shoals for docking purposes, but on the contrary the whole waterway was reserved by the statute forever from sale or lease. And, finally, the plat, by reference to which all lots were sold, showed a pierhead line at the point of navigable water. This situation, it is urged, indicates that the lots were sold as part of a completed project, that it was intended they should have full shipping facilities, and that since the State could not lease the shoals under then existing legislation, it must have been the intention that abutting owners should have the right of access to the pierhead line. This argument of the Railroad rests, however, upon an assumption which is at least open to serious doubt. It asserts that under then existing legislation no state official was authorized to permit the grantee to construct a wharf in East Waterway. By the constitution (Article XV, § 1, and by Act of March 28, 1890, p. 668) provision had been made for the establishment of harbor lines in navigable waters. It appears from *Wilson v. Oregon-Washington Railroad & Navigation Co.*, 71 Washington, 102, 107, to have been the practice to permit parts of the

harbor area so created to be used for the erection of piers and wharves. East Waterway was and is one of the navigable waters of the State. Our attention has not been called to any statute or decision which indicates that at the time of the original grant power to create harbor areas in it and to grant permits to erect wharves therein would not have been possessed by the harbor commissioners.

Even if the assumptions upon which the arguments rest were all true, the conclusion contended for would not follow. Ever since the organization of the State it has been the clearly defined policy of Washington not to grant riparian rights in navigable waters. This policy, declared in its constitution and expressed in careful legislation, has been consistently enforced by its courts. A grant by implication of the riparian right here asserted might perhaps be inferred in other jurisdictions from the circumstances stated. But in Washington such an implication seems wholly inadmissible. If in the development in question it had been the intention of the State to make such a radical departure as that for which the Railroad contends, the intention would doubtless have been expressed by appropriate language in the deed. But East Waterway was not even mentioned in it. Until we are so informed by the Supreme Court of Washington, we cannot, in the light of the waterway history of the State, believe that there were implications in the situation described which without more are sufficient to indicate an intention to depart from the settled policy of the State.

So far as the pierhead lines are concerned, the Railroad concedes that their establishment by the United States did not create as against the State a right to wharf out. They merely fixed the line beyond which piers might not extend. Compare *Wilson* v. *Oregon-Washington Railroad & Navigation Co., supra,* pp. 107, 108. And the power of the United States in this respect was not exhausted by

its first exercise. *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 638. The lines so fixed, although acted upon by the erection of piers, could be changed by the United States at any time. *Greenleaf Johnson Lumber Co.* v. *Garrison,* 237 U. S. 251. From the authorities to which we have been directed it appears that under the laws of the State the presence of pierhead lines on the plat could have no effect other than as a publication of action taken by the Federal Government. In *Puget Mill Co.* v. *State,* 93 Washington, 128, decided in 1916, the power of state officials to establish such lines is expressly denied by Judge Chadwick, who said:

"The use of the words 'pierhead line' on the plat prepared by the state, and in the decree, is an unfortunate misuse of terms. The words mean nothing under our constitution and statutes. In some of the eastern states, we understand that 'pierhead lines' are defined, but the constitution makers in this state were careful to avoid the confusion that may result from the drawing of an arbitrary line beyond which piers and docks should not be erected, by providing for an inner and an outer harbor line with an intervening area subject to state ownership and control."

It is unnecessary, therefore, for us to consider whether on this record it is open to the Port to contend that pierhead lines were in fact never fixed by any state official.

*Fifth.* The Port renews here the objection that the case was improperly removed from the state court, *Germania Insurance Co.* v. *Wisconsin,* 119 U. S. 473; *Postal Telegraph Cable Co.* v. *Alabama,* 155 U. S. 482; insisting that since the State is the owner of the bed of East Waterway, it is the real party in interest, *Murray* v. *Wilson Distilling Co.,* 213 U. S. 151; *Lankford* v. *Platte Iron Works Co.,* 235 U. S. 461; and that it has not merely a governmental interest, as in *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, 390, and in *Missouri, Kansas & Texas*

*Ry. Co.* v. *Missouri Railroad & Warehouse Commissioners,* 183 U. S. 53, 60.   The objection to the jurisdiction of the District Court is clearly unsound.   The Port being a municipal corporation under the laws of Washington is a citizen of that State and could have been sued in the federal court.   *Lincoln County* v. *Luning,* 133 U. S. 529; *Chicot County* v. *Sherwood,* 148 U. S. 529.   It had both the power and the duty to bring suit to protect the interests here involved; and it had a direct financial interest in the result.   For c. 168 of the Laws of 1913 provides for a payment by abutting owners, in the nature of a rental, for the permit to use parts of the waterways in the erection of wharves, docks or other structures; and that 75% of such rental shall be paid to the county "for the use of said port district."   The Port has thus an independent financial interest in this controversy; and although the State has also an interest, suit against the Port would not be prevented by the Eleventh Amendment.   What effect the judgment in this case will have upon the State's interest we have no occasion to consider.   Compare *Tindal* v. *Wesley,* 167 U. S. 204; *Hopkins* v. *Clemson Agricultural College,* 221 U. S. 636.

*Reversed, and the cause remanded to the District Court for further proceedings in conformity with this opinion.*