**NE–BO–SHONE ASS'N, Inc., v. HOGARTH et al.**

**No. 2605.**

District Court, W. D. Michigan, S. D.

Feb. 17, 1934.

Doyle & Lewis, of Toledo, Ohio, and Knappen, Uhl, Bryant & Snow, of Grand Rapids, Mich., for plaintiff.

Patrick H. O'Brien, Atty. Gen., Gerald K. O'Brien, Deputy Atty. Gen., Judson E. Richardson, Asst. Atty. Gen., and Willis B. Perkins, Jr., Dorr Kuizema, and Robert S. Tubbs, all of Grand Rapids, Mich., for defendants.

RAYMOND, District Judge.

The substantial purpose of this action is to determine whether or not the general public has the right to take fish from that portion of Pine river which traverses plaintiff's property. Pine river is a rapid and tortuous stream, approximately 100 miles in length, which flows in a northwesterly direction through four Michigan counties and empties into the Manistee river. From August, 1925, a large portion of the lands through which the river flows was owned by the Ne-Bo-Shone Association, organized as a voluntary association. On November 7, 1932, this voluntary association became a corporation under the laws of Ohio, for the purpose, as stated in its articles of incorporation, of "acquiring by purchase, lease or otherwise, real

estate for club' houses, for a fishing and hunting preserve, and for owning, improving and holding the same for accommodation, pleasure and entertainment of its members." The evident intention was to maintain a private fishing preserve, through ownership of both banks of the river. It appears from the evidence that the corporation did become the owner of the land on both banks for a distance of about seven miles. The average depth of the stream on plaintiff's property under normal conditions is about two and a half feet, while the average width is about fifty feet, these measurements varying materially in different parts of the stream and in different seasons. It does not appear that the river has ever been navigable for boats for commercial purposes. Beginning about the year 1880, the stream was used extensively, both with and without the aid of dams, for floating logs to various mills along its course. This continued for a period of from thirty to forty years, with gradually diminishing use as the timber along the banks became exhausted. The principal later use of the river was and still continues to be as a trout stream. For many years it has been obstructed at many places throughout its length by log jams, stumps, snags, stones, and ripples, especially at the numerous sharp bends. For the purpose of providing additional fish cover and to improve the stream for trout fishing, and also for the purpose, to a very considerable extent, of preventing navigation thereon and the free passage of fishermen and boats up and down the river, plaintiff has materially added to the obstructions already in that portion of the river to which it claims title.

Subsequent to the decision of the Supreme Court of Michigan in the case of Collins v. Gerhardt, 237 Mich. 38, 211 N. W. 115, holding, in an action for trespass, that a portion of Pine river which traverses lands immediately adjacent to those owned by plaintiff is legally navigable and public, difficulties arose between guards employed by plaintiff and sundry individuals who insisted upon the right of the public to fish in the stream. Attempts were made by fishermen to remove by force certain of the log jams and other obstructions. This was prevented by the guards. Both sides to the controversy presented petitions to the Michigan conservation department for action. An investigation by the Attorney General ensued which resulted in the service of notice upon plaintiff that obstacles in the river must be removed by November 15, 1932, and in advice to the public

that it had the right to remove obstructions and to protection by the state in so doing. Plaintiff thereupon brought this action to enjoin the Michigan conservation department, the Attorney General of the state, and individuals who had threatened action from taking steps to remove the obstructions.

Several of the issues raised by the pleadings are not now urged by defendants. Apparently the jurisdiction of the court, questioned upon several· grounds by the pleadings, is conceded. The principal issue is whether plaintiff has the right to maintain a private fishing preserve upon its lands for the exclusive use of its members and to exclude the public from Pine river. Defendants maintain that Pine river is a navigable stream and that both under the common law and by virtue of section 6425 of the Compiled Laws of Michigan of 1929 the public has the right to fish therein. That section reads: "The People of the State of Michigan enact, That in any of the navigable or meandered waters of this state where fish have been or hereafter may be propagated, planted or spread at the expense of the people of this state or the United States, the people shall have the right to catch fish with hook and line during such seasons and in such waters as are not otherwise prohibited by the laws of this state."

There appears to be no real distinction between the statement or description by the courts of the United States of the test of navigability and by the Supreme Court of Michigan. See The Daniel Ball, 10 Wall. (77 U. S.) 557, 19 L. Ed. 999; The Montello, 20 Wall. (87 U. S.) 430, 22 L. Ed. 391; United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. Ed. 465; United States v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. Ed. 844; Toledo Liberal Shooting Co. v. Erie Shooting Club (C. C. A.) 90 F. 680; Harrison v. Fite (C. C. A.) 148 F. 781; Gratz v. McKee (C. C. A.) 270 F. 713; Moore v. Sanborne, 2 Mich. 520, 59 Am. Dec. 209; Lorman v. Benson, 8 Mich. 18, 77 Am. Dec. 435; Tyler v. People, 8 Mich. 319; Thunder Bay River Booming Co. v. Speechly, 31 Mich. 336, 18 Am. Rep. 184; Attorney General v. Evart Booming Co., 34 Mich. 462; White River Log, etc., Co. v. Nelson, 45 Mich. 578, 8 N. W. 587, 909; Buchanan v. Grand River, etc., L. R. Co., 48 Mich. 364, 12 N. W. 490; Burroughs v. Whitwam, 59 Mich. 279, 26 N. W. 491; Sterling v. Jackson, 69 Mich. 488, 37 N. W. 845, 13 Am. St. Rep. 405; City of Grand Rapids v. Powers, 89 Mich. 94, 50 N. W. 661, 14 L. R. A. 498, 28

Am. St. Rep. 276; Baldwin v. Erie Shooting Club, 127 Mich. 659, 87 N. W. 59; People v. Horling, 137 Mich. 406, 100 N. W. 691; Cole v. Dooley, 137 Mich. 419, 100 N. W. 561; Giddings v. Rogalewski, 192 Mich. 319, 158 N. W. 951; Winans v. Willetts, 197 Mich. 512, 163 N. W. 993; Putnam v. Kinney, 248 Mich. 410, 227 N. W. 741.

██ In the case of Collins v. Gerhardt, 237 Mich. 38, 211 N. W. 115, 118, the Supreme Court of Michigan reviewed many of these cases and reaffirmed the doctrine of Moore v. Sanborne, supra, by declaring all rivers navigable and public which in their natural state were capable of floating logs, boats, and rafts. Upon the record in this case, Pine river is clearly a navigable and public stream within this definition.

██ It was also held in the Collins Case (in accordance with the ruling in the case of Nedtweg v. Wallace, 237 Mich. 14, 208 N. W. 51, 211 N. W. 647) that the state of Michigan upon admission to the Union became vested with the title to the beds of all navigable rivers impressed with a perpetual trust for the preservation of the public right of navigation, fishing, etc., and that, whether the title of a private owner be derived by purchase and grant from the state or by patent from the United States, his title is subject to a like trust. The court said:

"From this it follows that the common-law doctrine, viz., that the right of fishing in navigable waters follows the ownership of the soil, does not prevail in this state. It is immaterial who owns the soil in our navigable rivers. The trust remains. From the beginning the title was impressed with this trust for the preservation of the public right of fishing and other public rights which all citizens enjoyed in tidal waters under the common law.

"Pine river is navigable. In its waters the people have the common right of fishing. The plaintiff, though owner of the soil, has no greater fishing rights than any other citizen. Their rights are equal and correlative. So long as water flows and fish swim in Pine river, the people may fish at their pleasure in any part of the stream, subject only to the restraints and regulations imposed by the state. In this right they are protected by a high, solemn, and perpetual trust, which it is the duty of the state to forever maintain. Of course, in exercising this right people cannot go upon the uplands of riparian owners in order to gain access to the water. If they do that they are guilty of trespass. * * *

"The state may surrender the technical fee title to such lands, but it cannot unshackle them from the trust which continues no matter where the technical fee title may rest. Most of the states retain the technical fee title in themselves. This state has never by legislative action surrendered such title, but by judicial polity which has established a rule of property this court in numerous decisions has held that the riparian owner takes title to the thread of the stream. But as I have pointed out, such title is burdened with the trust, and, as I shall presently show, this court has expressly recognized such trust and unequivocally adopted the trust doctrine."

It is strenuously urged by counsel for plaintiff that the decision in Collins v. Gerhardt is not binding on this court because it overturned a rule of property under which plaintiff's rights had vested, and ignored long-settled doctrines of riparian rights which had become rules of property.

██ In the case of Hinde v. Vattier, 5 Pet. (30 U. S.) 398, 401, 8 L. Ed. 168, it is held that questions relating to the titles and incidents of real property are regarded as local questions, as to which the decisions of the highest state court are binding upon the federal courts. It is there said: "It would be productive of infinite inconvenience to suitors, and to all persons interested in the lands embraced in this patent, if its publication among the laws of a state, and the admission of the book of laws as evidence of the grant after its solemn adoption by the supreme court of Ohio as a settled rule of property; should be questioned in the courts of the United States. There is no principle better established, and more uniformly adhered to in this court, than that the circuit courts, in deciding on titles to real property in the different states, are bound to decide precisely as the state courts ought to do. Wilkinson v. Leland, 2 Pet. 656 [7 L. Ed. 542]. The rules of property and of evidence, whether derived from the laws or adjudications of the judicial tribunals of a state, furnish the guides and rules of decision in those of the union, in all cases to which they apply, where the constitution, treaties, or statutes of the United States do not otherwise provide."

In the case of Edward Hines Yellow Pine Trustees v. Martin, 268 U. S. 458, 45 S. Ct. 543, 545, 69 L. Ed. 1050, it is stated: "An answer to these questions involved an interpretation of the state statute and the application of it, as interpreted, as a rule of property determinative of rights in titles to land within the state. Both the meaning of stat-

888

utes of a state and the rules of the unwritten law of a state affecting property within the state are peculiarly questions of local law to be ascertained and established by the state courts. For that reason federal courts ordinarily hold themselves bound by the interpretation of state statutes by the state courts."

In the same case a limitation upon the rule is recognized to the effect that, where the rule of property is established only by a single state decision rendered after the rights involved in the case in the federal court accrued, the federal courts may depart from the rule as it did in Kuhn v. Fairmont Coal Co., 215 U. S. 349, 30 S. Ct. 140, 54 L. Ed. 228. To warrant application of the exception, however, the reasons for so applying it should be clear and unmistakable. Examination of the authorities upon which the majority of the court in Collins v. Gerhardt based the decision is convincing that there was no departure from established precedents, and that the rule of property relating to riparian rights was declared as it had previously existed in this state.

█ Many cases recognize the rule that the federal courts will follow the decisions of the highest court of the state in questions involving riparian and water rights attached as an incident to the ownership of real property. See Rundle v. Delaware & Raritan Canal Co., 14 How. (55 U. S.) 80, 14 L. Ed. 335; St. Louis v. Rutz, 138 U. S. 226, 11 S. Ct. 337, 34 L. Ed. 941; Kaukauna Water Power Co. v. Green Bay, etc., Canal Co., 142 U. S. 254, 12 S. Ct. 173, 35 L. Ed. 1004; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331; St. Anthony Falls Water Power Co. v. Board of Water Commissioners, 168 U. S. 349, 18 S. Ct. 157, 42 L. Ed. 497; Hardin v. Shedd, 190 U. S. 508, 23 S. Ct. 685, 47 L. Ed. 1156; Weems Steamboat Co. v. People's Steamboat Co., 214 U. S. 345, 29 S. Ct. 661, 53 L. Ed. 1024, 16 Ann. Cas. 1222; Port of Seattle v. Oregon & W. R. Co., 255 U. S. 56, 41 S. Ct. 237, 65 L. Ed. 500; Fox River Paper Co. v. Railroad Commission of Wisconsin, 274 U. S. 651, 47 S. Ct. 669, 71 L. Ed. 1279.

In the case of Percy Summer Club v. Astle (C. C. A.) 163 F. 1, 15, which involved, as here, a claim to the exclusive right of fishing in a body of water, it is stated:

"The case before us concerns the construction to be put upon the language of a deed. The language is of common use. The construction put upon this language, as is admitted, has varied in the states of the Union. In interpreting the language of a deed of land lying in a particular state the interpretation

put upon that language by the state court necessarily carries peculiar weight. 'The question of the title of a riparian owner is one of local law.' Whitaker v. McBride, 197 U. S. 510, 512, 25 S. Ct. 530, 531, 49 L. Ed. 857. To decide the case before us, we need not decide if, in construing the deeds upon which the complainant relies, we are bound to follow Concord Mfg. Co. v. Robertson [66 N. H. 1, 25 A. 718, 18 L. R. A. 679], and Dolbeer v. Water Works Co. [72 N. H. 562, 58 A. 504], or if we should merely 'lean towards an agreement of views with the state courts if the question seems to them (the federal courts) balanced with doubt.' * * *

"Even if the cases decided before State v. Roberts [59 N. H. 256, 47 Am. Rep. 199] are not in point, yet they contain many dicta which indicate that in the absence of an express grant from the state the fishery of a great pond is not of private ownership, and the facts in Bell v. Offutt are hardly distinguishable from those in the case before us. Had it been reported, it must have affected considerably the arguments upon both sides. Therefore we find nothing which requires us to differ from the considered opinion of the Supreme Court of New Hampshire."

But were the questions involved of a character to warrant the court in exercising its judgment as an independent tribunal, the result would not be different. It is plaintiff's contention that use or capability of use for floatage does not establish the navigability of Pine river; that the right of floatage is an easement or right of passage arising out of necessity, and that when such use ceased some years ago the right no longer remained; that the right to fish is not incident to floatage or connected therewith, but is a profit á prendre belonging exclusively to the owner of both banks of the stream. As to the decision of Collins v. Gerhardt, 237 Mich. 38, 211 N. W. 115, it is urged that the Supreme Court of Michigan either completely misconceived or deliberately ignored the doctrines announced by a long line of earlier cases which had become a rule of property in the state. The court finds itself not in accord with these contentions.

Much of the difficulty in analysis of the various cases and in application of the principles announced arises from the failure in some instances to distinguish between the so-called "test" and the object of the test. The human mind is prone to confuse definitions with the thing defined, symptoms with the disease, theology with religion, and descriptions with the thing described. By too close

attention to the bait the game escapes. This tendency has been noted by the Supreme Court in the class of cases here being considered. In the case of The Genesee Chief v. Fitzhugh, 12 How. (53 U. S.) 443, 455, 13 L. Ed. 1058, Chief Justice Taney said: "And as the English definition was adopted in our courts, and constantly used in judicial proceedings and forms of pleading, borrowed from England, the *public character* of the river was in process of time lost sight of, and the jurisdiction of the admiralty treated as if it was *limited by the tide. The description of a public navigable river was substituted in the place of the thing intended to be described.* And under the natural influence of precedents and established forms, a definition originally correct was adhered to and acted on, after it had ceased, from a change in circumstances, to be the true description of public waters." (Italics by the court.)

The distinction sought by the variously stated tests is that between public and private waters. In England, the test was whether or not the tide ebbed and flowed. In America, navigability was at one time generally regarded as the criterion, and later, in the states where logging and lumbering became an important commercial enterprise, floatability of logs was made the test. It is to be noted that, while navigability was made the guide as to what constituted public waters, it was not made the test of the *scope* of the public use of such waters. While floatability was often stated to be the test of *navigability*, it seems apparent that, in fact, it was not so. The very purpose for the change of test was to classify as public waters streams which were not commercially navigable but which were within the test of floatability. If these streams had been navigable, no need for a more inclusive test would have arisen. The real purpose of a change of test was to apply a broader definition to bring within the scope of public waters, streams and lakes which under former definitions would have been regarded as private. There is as much reason for saying that, when the test of public waters was limited to navigability, the only purposes for which such streams could be used were those of navigation and commerce, as to say that, when the test is floatability, the only purpose for which the stream to which the test is applicable may be used is the floating of logs. While the courts have frequently said that floatability is a test of navigability, it is clear that what was intended was that floatability is a test of whether the waters to which the test is applied are public or private.

Because some waters are public, certain rights attach thereto. These rights are not limited by the test by which the nature of the waters is determined but to the rights incident to the characterization as public of the stream or body of water.

In the Collins Case the Supreme Court of Michigan has clearly held that the riparian rights of an owner of land upon both sides of a stream of water which is within the classification of public waters are limited and restricted by certain rights of the public to use the water. The extent of the restriction depends upon the nature and scope of the public right to use, and upon this the cases are far from uniform. In Wisconsin it is held that public waters may be used and enjoyed for any legitimate public purpose. In the case of Willow River Club v. Wade, 100 Wis. 86, 116, 76 N. W. 273, 281, 42 L. R. A. 305, it is said: "* * * The waters of the state belong to the state, not for one public purpose only, but for all public purposes originally designed, and which should have been, and should be, most carefully guarded. It is open to serious doubt as to whether the surrender to private ownership of the property of the state in submerged lands, to any extent, was not a mistake. Certain it is that such title, in all territory out of which this and other northwestern states were carved, was vested in them in trust for public purposes of the highest importance, which have grown, and are likely to grow, with the lapse of years. Probably, if such importance had been fully foreseen at the start, the state's interests would have been more rigidly and jealously guarded, and private ownership not been allowed to invade at all, either the public title or the public use; certainly not, without consideration, by mere operation of state policy judicially declared."

█ It is not necessary here to outline all of the rights of the public in and to public waters or to decide whether they do or do not include the rights to remove ice, to obtain municipal water supply, to erect municipal power dams, to skate, to bathe, to boat for pleasure, and divers other commercial and pleasurable uses. Here we are concerned only with the right to take fish. That this right has always been recognized as incident to a determination that the waters concerned are public in character is sustained by such a wealth of authority that citations are unnecessary. It is difficult to see why the right to navigate should include, *as an incident thereto,* the right to take fish. It is the view of the court that this right to take fish is not a right

incident to navigation but a right arising from the fact that the waters in which the right is claimed are public waters. Both rights arise from the fact that the waters are public, not private. The rights coexist. Neither finds its source in the other. See 27 Harvard Law Review, page 750.

In my opinion, the right of fishing in public waters is common to the public, subject only to the limitations of the statutes of the state relative to fishing. This right is what was known at common law as a "common of piscary." Confusion seems always to have existed as to the nature and extent of that right. In Blackstone's Commentaries (book 2, p. 40), is found the following: "For it must be acknowledged, that the rights and distinctions of the three species of fishery are very much confounded in our law-books; and that there are not wanting respectable authorities which maintain that a several fishery may exist distinct from the property of the soil, and that a free fishery implies no exclusive right, but is synonymous with common of piscary."

The right was a matter of controversy prior to the wresting from King John of Magna Charta in the year 1215, and has so continued through many years. By that charter it was directed that rivers that were fenced should be laid open and grants of exclusive fisheries for the future were prohibited.

Throughout the centuries, the oceans, lakes, rivers, and tributary streams have been highly useful to mankind, and, to a considerable degree, indispensable for fishing, travel, and commerce. In modern times, not only are these resources used for various industrial enterprises, but, with the congestion and stress of urban life, has come necessity for rest and recreation. The utilitarian uses of the waters have been broadened or supplanted to meet these other important needs. With increasing private ownership of lands bordering lakes and streams, the average citizen finds it difficult or impossible to provide himself and his family with opportunities for rest and play. There should, in these conditions, be no narrowing of rights hitherto recognized. The citizen ought not (for other than the most compelling reasons) to be deprived of those blessings which nature's bounty has provided.

Wholly apart from the foregoing views upon the substantive law of the case is another and equally important consideration leading to the same result. The material relief sought is injunction against state officials to enjoin acts based upon rights which are strictly local. The jurisdiction of the court grows out of the fact of diversity of citizenship. In these circumstances, the remedy prayed is obtainable in federal courts only where the "path is clear" and in a case "reasonably free from doubt." In the recent case of Hawks v. Hamill, 288 U. S. 52, 53 S. Ct. 240, 243, 77 L. Ed. 610, Justice Cardozo has clearly expressed the views of the United States Supreme Court in this class of litigation. He says:

"The case thus far has been considered from the viewpoint of the substantive law, the basic rights and duties contested by the litigants. There is another path of approach that brings us to the same goal, an approach along the line of the law of equitable remedies. Caution and reluctance there must be in any case where there is the threat of opposition, in respect of local controversies, between state and federal courts. Caution and reluctance there must be in special measure where relief, if granted, is an interference by the process of injunction with the activities of state officers discharging in good faith their supposed official duties. In such circumstances this court has said that an injunction ought not to issue 'unless in a case reasonably free from doubt.' Massachusetts State Grange v. Benton, 272 U. S. 525, 527, 47 S. Ct. 189, 190, 71 L. Ed. 387. The rule has been characterized as an 'important' one, to be 'very strictly observed.' Id., 272 U. S. at pages 527, 529, 47 S. Ct. 189, 71 L. Ed. 387. Compare Gilchrist v. Interborough Rapid Transit Co., 279 U. S. 159, 49 S. Ct. 282, 73 L. Ed. 652; Cavanaugh v. Looney, 248 U. S. 453, 456, 39 S. Ct. 142, 63 L. Ed. 354. It is such interference by the process of injunction with the activities of state officers that the respondents now seek. * * *

"Only a case of manifest oppression will justify a federal court in laying such a check upon administrative officers acting colore officii in a conscientious endeavor to fulfill their duty to the state. A prudent self-restraint is called for at such times if state and national functions are to be maintained in stable equilibrium. Reluctance there has been to use the process of federal courts in restraint of state officials though the rights asserted by the complainants are strictly federal in origin. Massachusetts State Grange v. Benton, supra; Stratton v. St. Louis S. W. Ry. Co., 284 U. S. 530, 52 S. Ct. 222, 76 L. Ed. 465; Matthews v. Rodgers, 284 U. S. 521, 52 S. Ct. 217, 76 L. Ed. 447. There must be reluctance even greater when the rights are

strictly local; jurisdiction having no other basis than the accidents of residence. * * *

"Our process does not issue unless the path is clear."

█ The conclusion of the court is that the principles of Magna Charta, of the ordinance of 1787 which declared navigable waters to be public highways and forever free, the rules of common law, as announced by the Michigan Supreme Court, and legislative enactment found in section 6425 of the Compiled Laws of Michigan, necessitate denial of the relief sought by plaintiff. A decree of dismissal will be entered.