MIDLAND BRIDGE CO. et al. v. HOUSTON & B. V. RY. CO. et al.

(Circuit Court of Appeals, Fifth Circuit. November 24, 1920.)

No. 3480.

1. Navigable waters ⬅20(2)—Alterations in mere details of plan for bridge need not be approved by Secretary of War.

Where the plans for a bridge over a navigable river have been approved by the Secretary of War as required by Act March 3, 1899, § 9 (Comp. St. § 9971), mere alterations in details which in no way contemplate any change in the size, nature, or relation to the stream of the completed bridge do not require approval by the Secretary as a condition to the continuing in force between the parties of a contract for construction of the bridge.

2. Navigable waters ⬅20(2)—Subsequent contract for removal of collapsed bridge not invalidated by failure to obtain approval.

A subsequent contract for the removal of a collapsed bridge, which obstructed a navigable stream, where the compensation for such removal was to be measured by the determination of which party was in fact responsible for such collapse, would not be invalidated by a failure to secure the approval of the Secretary of War to alterations in the original contract for construction of such bridge, even if such approval was necessary to authorize such alterations.

3. Bridges ⬅20(6)—Contractor's fault shown to be cause of pier's fall.

Evidence held to sustain the finding of a master, sustained by the District Court, that the falling of a bridge pier during construction of the bridge was due to the fault and negligence of the contractor in employing improper methods of construction and using defective concrete, and not to defects in the plans furnished by the owner.

4. Appeal and error ⬅1022(2)—Findings by master and trial court conclusive. if supported by evidence.

Where a master and the trial court agree on findings of fact, they are conclusive on the appellate court, if there is any substantial evidence to support them.

Appeal from the District Court of the United States for the Southern District of Texas; Joseph C. Hutcheson, Jr., Judge.

The Midland Bridge Company and others appeal from the decree on

a petition of intervention in suits against the Houston & Brazos Valley Railway Company and others.    Affirmed.

For opinion below, see 257 Fed. 213.

W. S. Hunt, of Houston, Tex., and William C. Scarritt and Edward L. Scarritt, both of Kansas City, Mo., for appellants.

O. L. Stribling, of Waco, Tex., and John A. Mobley, of Houston, Tex., for appellees.

Before WALKER, BRYAN, and KING, Circuit Judges.

KING, Circuit Judge.    The Midland Bridge Company, a partnership consisting of Henry Freygang and Albert A. Trocon, on July 1, 1914, made a contract with the Houston & Brazos Valley Railway Company and the county of Brazoria, Tex., as owners, to build a bridge across the Brazos river between Freeport and Velasco, Tex., about four miles from the Gulf of Mexico, according to certain plans and specifications prepared by the owners through their engineers, attached to and made a part of said contract, known and hereinafter referred to as the "construction contract."

The construction of said bridge proceeded to the completion of three piers on the Velasco side, pier 3 being a pivot pier located about one-third of the way across the river, and carrying a revolving steel span 290 feet long.    So much of this steel span was completed as connected pier 2, which was at the shore line, with pier 3, and two members of the span beyond pier 3 were also completed, when, on May 7, 1915, pier 3 toppled over and fell into the river, throwing the steel span attached to it more than 50 feet downstream from the pier site.

A dispute arose between the bridge company and the owners as to whether the pier fell by reason of improper construction by the bridge company or defective plans furnished by the owners.    The dispute being unsettled, in order to provide, meanwhile, for the removal of said steel from the river, a contract was entered into, on June 21, 1915, between said bridge company, the contractors, and said railway company and said county of Brazoria, the owners, for the removal of said steel by the contractors.    The contractors were to keep an accurate account of the cost of all (1) labor employed; (2) material used; and (3) the rental, or use value, of all boats, equipment, machinery, and appliances, other than what they then owned and had at or near the bridge site.    Fifteen per cent. of these sums was to be added, for the personal services of the contractors and for the rental of the boats, equipment, machinery, and appliances then owned by them, and the sum of the items 1, 2, and 3, and said 15 per cent. thereon should be the contract value, as that term was used in said second contract.    If the contract value did not exceed $4,000, the owners should pay one-half thereof in full discharge of their obligations under this contract; if it exceeded $4,000, the owners should pay to the contractors one-half of $4,000 and all of the contract value exceeding said sum, said payments to be made biweekly on receipt of statements from said contractors.

Said contract recited the existence of said dispute as to the responsibility for said fall, and provided that it should not estop either party in respect to said contention, and that if it should be thereafter established or agreed by the parties interested, or be judicially determined

that the contractors were right in their claim and assertion, then the portion of said contract value, which by the terms of this contract they agreed to bear, should be allowed and paid to them by the owners; on the other hand, if it should be established, agreed, or judicially determined that the contractors were liable for the loss or damage caused by the fall of said part of said bridge, the portion of the contract price that the owners had paid under this contract should be repaid to them by the contractors. The contract value for removing said steel was reported as required, and aggregated $9,226.48; but no biweekly or other payments of any part thereof were made by the owners.

On October 27, 1915, the defendant railway company was put in the hands of a receiver on a creditors' bill, filed in the United States District Court for the Southern District of Texas. Subsequently a bill to foreclose a first mortgage on the property of said railway company was filed in said court by the Mercantile Trust Company, a corporation of Missouri, against said railway company. The two cases were consolidated, and the receivership extended under this second bill.

On June 26, 1916, an intervening petition was filed in said consolidated cause by said Midland Bridge Company, seeking to recover said sum of $9,226.48, the contract value under said second contract, and also the further sum of $625.32 for items of material and labor furnished on other accounts. It was claimed in said petition that said contractors were not liable or responsible for the collapse of said pier 3, and that therefore the owners were liable for said entire contract value; that all the labor and material sued for was furnished within six months of the date of the appointment of the receiver, and that under the terms of the order of appointment such items were entitled to be adjudged preferential claims, superior to the mortgage.

The answer of the railway company and the receiver set up that the interveners were liable and responsible for the loss or damage that had occurred, because a part of the bridge constructed by them did not stand up, and denied all liability under said contract for removing said steel. While admitting most of the items composing said $625.32, the defendant pleaded a counterclaim, which by stipulation was admitted to be $2,018.67, arising out of matters disconnected with the contract sued on. Interveners' right to a preference was also denied. The intervention and defenses thereto were referred to a master, to take testimony and report his findings, judgments, and recommendations to the court.

The master heard voluminous testimony as to the original contract and the building of said collapsed pier 3 thereunder. He found that the contractors were responsible and liable for the collapse of said pier 3, and that they were not entitled to recover any part of said contract value for removing said steel. On the other items he found a balance in favor of the defendant railway company on said admitted counterclaim of $1,692.08.

On exceptions to the master's report, which challenged the correctness of his finding that interveners were liable for the collapse of said pier 3, the District Judge, after a careful review of the evidence, held that on the findings of fact by the master, in which he concurred, the

interveners were responsible for the collapse of said pier, and overruled the exceptions to the master's report. A decree in accordance therewith was entered.

The errors assigned, insisted on in appellant's brief, attack the correctness of the decision that the interveners are not entitled to recover on the contract for removing said steel, because liable and responsible for the collapse of pier 3.

Three causes were assigned for the fall of the pier: First, that the original plan called for an excavation of 35 feet below mean low tide, in which the pier should be erected, and that this was stopped at 32 feet; that only 21 piles were driven when the excavation was carried to this depth, at intervals greater than 3½ feet between centers, when the construction contract made this the maximum distance, and when proper piling required many more piles; second, that the concrete at the base of said pier was defective, and had become disintegrated, causing the pier to topple; third, that the interveners (contractors) had negligently dredged an excavation near the lower side of pier 3, which occasioned the river to scour, thus weakening the foundations under the pier.

[1, 2] The master found as to the change of the depth of the excavation that it was not authorized by the engineers of the owners in charge, and was therefore done at the contractors' risk; that the change was not authorized by the War Department, as required by the Act of Congress of March 3, 1899, c. 425 (6 Fed. Stat. Ann. 805), and therefore was not authorized to be made by the contractors. He also held that each of the other causes existed and operated in causing the collapse. The District Judge disagreed with the master as to the effect of no approval of the Secretary of War having been obtained to the change of depth of the excavation.

We do not think a mere alteration in detail, which in no way contemplated any change in the size, nature, or relation to the stream of the completed bridge would have to be approved by the Secretary of War as a condition to an existing contract for construction continuing of force between the parties thereto. We also think that, even if such approval was necessary to legalize such change, the failure to obtain it would not affect the rights of the parties in this present suit.

This is a suit brought to recover, on a contract made for the removal of the steel out of the river where it had fallen, the contract price agreed to be paid for such removal. This contract needed no approval of the Secretary of War or any other government official. It was stipulated that if the fall of this pier 3 was due to the conduct of the contractors they should not recover for the contract value of such removal. If they were not liable and responsible for such fall, then they were entitled to so recover. It was agreed by this second contract that the question of responsibility for the fall of the pier should fix the payment to be made under this contract for removing the steel. We can see no reason why this was not a valid agreement.

The District Judge also disagreed with the master in his finding that the change in depth of said excavation was without the owners' assent. He held that under the decision of this court in Penn Bridge Co. v.

City of New Orleans, 222 Fed. 737, 138 C. C. A. 191, and like cases, the contractors could recover if the collapse of the pier 3 was due solely to defective plans furnished by the owners, if they did not know and had no reason to know the plans were defective.

Complaint is made that the court below held interveners, in order to sustain their intervention, had the burden of proving that the pier fell solely because of improper plans prepared by the owners, whereas the contractors insist the burden of proving that the collapse was due to other causes, for which the contractors were responsible, rested on the defendant owners.

The court below, while expressing the opinion that the burden rested on the interveners, first, to show that the collapse was due solely to defective plans of the owner; second, that they complied strictly with said plans; and, third, that they did not know and were not charged, in the course and progress of said work, with knowledge of said defects and that such a result was likely to occur because of them, nevertheless found that the evidence clearly showed the failure of the contractors to discharge their duty under the contract, and that had they done so the pier would not have fallen, and he, and the master find affirmatively a want of proper skill and a failure to comply with the contract in these particulars.

[3] Upon these several points, the District Judge found as follows:

"The evidence overwhelmingly established that the change in the plan was not at the suggestion of the owner, but of the contractor himself; that the engineer, Tolman, who for the county agreed to the change, rested his agreement not on his personal observation of the conditions, but upon the recommendation of the bridgemen, having the reputation of being skillful and accurate bridge builders of long experience; and the railway company, through Banks, gave the same assent, under the same influence. Therefore the change must be treated as a change made by the contractor and not the owner. It must be held that the contractor did not comply strictly and exactly with the plan of the owner, and that therefore, having failed on the first essential of the case, he cannot recover. Should, however, I be mistaken in this view of the law, and should the changed plan be treated, because of the owner's assent, as the owner's plan, still the intervener cannot recover, because the second obligation imposed upon him to prove that the structure fell because, and only because, of the strict compliance with the plan, has not been established. The master finds, and his findings are sustained by the evidence, that a large part of the cement in the pier which gave way was of a bad and worthless character, not in accordance with the plans, and wholly without sufficient tensile supporting strength. That the construction of the pier and cofferdam was done in a dangerous and improper manner, calculated to produce the very result that followed, through excessive dredging and lowering of the subsoil at and adjacent to the pier, and that these defective and improper conditions proximately contributed to and caused the fall of the pier."

The contention of the appellants, therefore, as to the burden of proof, is without merit in its application to the facts found by the court below. The court below also found on the facts as follows:

"While the master has made no finding on the third element of defendant's burden, it is as clear as the rest that it has failed to show that it did not know and was not charged with knowledge that such a result was likely to occur through the plans and methods adopted and employed. On the contrary, I find that under all the conditions, the danger from the use of the changed plan was or should have been known to the contractor, and that it could have

easily provided against it by placing the proper number of piles in the stream, and that knowing or being charged with knowledge of this fact, it wholly failed to take the elemental and necessary precautions; all the testimony agreeing that a sufficient number of piles would have kept the pier up forever. The testimony is affirmatively that the contractor knew the conditions surrounding the work as it progressed, especially the conditions caused by the excavation in the stream to obtain material to stop the leak in the cofferdam, and it was his duty to protect against the conditions caused by his own conduct by providing an adequate number of piles. Finding, then, as I do, not only that the contractor has wholly failed to show, with the clearness and certainty which the law requires when he seeks to evade a responsibility for the failure to fully complete the contract, that the fall was caused by defective plans of the owner, but that the evidence, on the contrary, affirmatively establishes that the plan, if it was a cause of the fall, was only one of the contributing causes, and that had the cement in the pier been in the proper condition, and the excavation in the stream not been made in the way and manner it was the pier would have stood indefinitely I sustain the master's findings and recommendations and order judgment accordingly."

The evidence shows that the change was agreed to at the suggestion of the contractors on the understanding that pilings were to be driven to furnish a foundation for said pier. The contract required that piles should not be further apart than 3½ feet between centers. The evidence disclosed the pilings driven were only 21 in number and were placed at a greater distance than 3½ feet between centers, and that this number of piles was selected by the contractors.

The evidence was practically without contradiction that the contractors should have known that the changed plan could not be safely used without a much larger number of piles, and that with such number of piles pier 3, if constructed of good concrete, would have stood for all time. This pier was being built in a cofferdam, which was to protect this excavation from invasion of water.

The contract required that the concrete should be deposited in dry hole. "No water to be permitted in caisson, cofferdam, or forms where concrete is deposited." There was undisputed evidence that there was a continual fight to keep the water out of this cofferdam; that a deep excavation was made in the riverbed a short distance outside of the cofferdam in order to get material to place between the timbering outside of the cofferdam, and its interior steel walls in an effort to stop the leaks; that two pumps were kept at work during the day, and one day and night, and although there was evidence that while this pier was being built in this excavation the water was kept from the freshly laid concrete, the evidence was very conflicting, and preponderated in favor of the view that the water was only kept down from covering the fresh concrete as laid, but that it was in water much of the time before it was dry.

There was abundant testimony that concrete so laid would be deficient in tensile strength. There was evidence supporting the finding that the lower part of this pier was composed of such defective concrete. There was testimony to the effect that when the pier toppled it drew off of some of the piles, leaving them standing, which was impossible if the concrete had possessed the proper tensile strength; also that after it fell a portion of the base was gone, and that disintegrated concrete material was found near the site of the pier. The evidence

preponderates heavily to the effect that the making of the excavation in the bed of the stream a short distance outside of the base of said pier 3 was unskillful engineering and likely to weaken the foundation of said pier, and caused a scour in the river bed that contributed to undermining said pier.

While the evidence is conflicting on some matters, there is abundant evidence to support every finding of fact made by the master and the District Court, and to support the decree of the court overruling all exceptions to these findings of fact. The decree in favor of the defendants and against said interveners follows as a necessary result from such findings of fact.

[4] Where the master and trial court agree on the findings of fact, they are conclusive on the appellate court, where there is any substantial evidence to support them. Last Chance Min. Co. et al. v. Bunker Hill & S. Mining & Concentrating Co., 131 Fed. 579, 66 C. C. A. 299; Mercantile Trust Co. v. Chicago, P. & St. L. Ry. Co., 147 Fed. 699, 78 C. C. A. 87; Moffatt v. Blake, 145 Fed. 40, 75 C. C. A. 265.

The decree of the District Court is therefore affirmed.