**UNITED STATES v. INGRAM, Administrative Officer and County Judge, Crittenden County, Ark. et al.**

No. 14511.

United States Court of Appeals Eighth Circuit.

March 17, 1953.

Writ of Certiorari Denied June 15, 1953.

See 73 S.Ct. 1136.

92

Roger P. Marquis, Atty., Department of Justice, Washington, D. C. (Wm. Amory Underhill, Asst. Atty. Gen., James T. Gooch, U. S. Atty., and Gerland P. Patten, Little Rock, Ark., and Robert D. Smith, Marianna, Ark., Asst. U. S. Attys., with him on the brief), for appellant.

James C. Hale and John A. Fogleman, Marion, Ark., for appellees.

Before GARDNER, Chief Judge, and THOMAS and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The United States sought an injunction to prevent Crittenden County, Arkansas, from dismantling part of the Harahan Bridge, which crosses the Mississippi River and links the States of Arkansas and Tennessee at the City of Memphis.[1] The District Court denied the injunction, 99 F.Supp. 465, and the Government has appealed.

One of the grounds on which the Government sought to prevent the threatened

1. Another injunction suit, brought against Crittenden County by the City of Memphis, has previously been before us, in City of Memphis v. Ingram, 8 Cir., 195 F.2d 338.

undertaking was that, as a matter of bridge modification, the dismantling project had not been the subject of a submission to and approval by the Chief of Engineers and the Secretary of War (now the Secretary of the Army, 61 Stat. 501, 5 U.S.C.A. § 181–1), within the requirement of 34 Stat. 84, 85, 33 U.S.C.A. § 491. Crittenden County conceded the lack of such submission and approval, but it contended that the dismantling involved was not within the application of this statutory requirement. We regard this question as the primary one in the case.

The Harahan Bridge had been built by the Arkansas and Memphis Railway Bridge and Terminal Company, under authority of an Act of Congress and its amendment, 37 Stat. 195 and 37 Stat. 359, approved in 1912.

The authority granted had been made subject in the Act to the general conditions that the bridge was to be located "at a point suitable to the interests of navigation" and that the structure was to be built, maintained and operated "in accordance with the provisions of the Act entitled 'An Act to regulate the construction of bridges over navigable waters,' approved March twenty-third, nineteen hundred and six". This regulatory Act, 34 Stat. 84, 33 U.S.C.A. § 491 et seq., which, as indicated above, is the one on which the Government relies, contained a provision that, "when, hereafter, authority is granted by Congress to any persons to construct and maintain a bridge across or over any of the navigable waters of the United States, such bridge shall not be built or commenced until the plans and specifications for its construction, together with such drawings of the proposed construction and such map of the proposed location as may be required for a full understanding of the subject, have been submitted to the Secretary of War and Chief of Engineers for their approval, nor until they shall have approved such plans and specifications and the location of such bridge and accessory works; and when the plans for any bridge to be constructed under the provisions of this Act have been approved by the Chief of Engineers and by the Secretary of War it shall not be lawful to deviate from such plans, either before or after completion of the structure, unless the modification of

such plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War."

The authorizing Act of 1912 had also contained a number of other provisions. Thus, there was an express clause that the bridge was to "be so constructed, maintained, and operated that, in addition to its use for railroad purposes, it shall provide for an adequate and a separate roadway and approaches and continuous use by the public as a highway bridge * * *." The Bridge Company was, however, given the right to sell and transfer the roadways of the bridge and their approaches, or any portion thereof, to any county, city, improvement district or municipality, and, in the event of this being done, it was provided that the Bridge Company would "be relieved of any requirement to maintain the property so sold * * *."

The bridge plans, as submitted to the Secretary of War and the Chief of Engineers and approved by them, had called for a superstructure for railroad use, with a projecting structure on each side thereof for use as a roadway. The bridge was so built. In 1917, the Bridge Company conveyed the roadways and their approaches to Crittenden County and to the City of Memphis, deeding to the former, for the sum of $40,000, the part thereof that lay within the State of Arkansas, and to the latter, for the sum of $25,000, the part that lay within the State of Tennessee. The Bridge Company retained title to the railroad portion of the bridge. The deeds contained a provision requiring the purchasers to keep the roadways and approaches in proper repair.

For a period of more than thirty years following the Harahan Bridge constituted the sole vehicular traffic way across the Mississippi River, within a distance of approximately 150 miles in either direction. As the years went by, however, the bridge came to be inadequate to handle the increasing volume of such traffic, and in 1939 Congress granted authority to a Bridge Commission from the two States to construct another bridge "at or near the city of Memphis". 53 Stat. 1338. This new bridge was built some 400 feet away from the Harahan Bridge and was opened to traffic in Decem-

ber, 1949. Shortly thereafter, Crittenden County closed the approaches and roadways of the Harahan Bridge on the Arkansas side. The new bridge, according to the undisputed evidence, had sufficient capacity to handle all the vehicular traffic which it was anticipated would exist between the two States at this point for many years to come.

At the time this suit was instituted, Crittenden County admittedly was intending to proceed with a dismantling of the structural projections, constituting the roadway portions of the Harahan Bridge, which lay within the State of Arkansas. The Bridge Company was willing that such dismantling be done. One of the objects of the County in doing the dismantling was to make the steel available for other local uses. The testimony showed that the dismantling would cover approximately 74 per cent of the total roadway on the bridge and that it would result in the removal from the bridge structure of some 320 tons of steel, principally "ten inch I-beams * * * 30 to 48 feet long." The dismantling operations are more specifically described in the evidence as consisting of "removal of the present timber floor and then * * * taking down the steel beams and struts and stringers and those portions of the cantilever arms that extend outside of the superstructure of the railroad bridge proper."

The provision of the Act of March 23, 1906, 34 Stat. 84, 33 U.S.C.A. § 491, has been quoted above, that "when the plans for any bridge * * * have been approved by the Chief of Engineers and by the Secretary of War it shall not be lawful to deviate from such plans, *either before or after completion of the structure,* unless the modification of such plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War." (Emphasis ours.)

The trial court was of the opinion that Crittenden County was right in its contention that this provision did not have any application to the intended dismantling. It said that "a change in a bridge which does not affect the location or affect the obstructive nature of the bridge [for purposes of navigation] does not require the approval of the Secretary of the Army or the Chief

of Engineers," and that here there was no showing, or even claim, that "the dismantling of this roadway will affect the navigation of the Mississippi River in any way * * *."

We do not believe that the Act of 1906, 34 Stat. 84, 33 U.S.C.A. § 491 et seq., is entitled to be so construed or applied. It is to be borne in mind that the authorizing, the locating, the constructing, the maintaining, the changing, and the removing of bridges or other structures in navigable streams, as questions of relationship or consequence to navigation, are matters wholly of legislative prerogative and control. See Miller v. Mayor, etc., of City of New York, 109 U.S. 385, 3 S.Ct. 228, 27 L.Ed. 971; Monongahela Bridge Co. v. United States, 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435. There is no right to do any of these things in the navigable waters of the United States, if Congress chooses not to allow them to be done. Within its plenary power of control in this field, Congress may permit or may forbid any or all of them to be done. And since any grant of authority which it so makes is of the nature of a grace or privilege, and not the regulation of a field of private rights, Congress necessarily may impose such limitations or conditions thereon as it sees fit, without relationship to any extraneous concept or test. Cf. United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243.

Whatever terms Congress has imposed on any granted bridge authority must therefore fundamentally be regarded as matters of legislative policy, having their source and scope in the absolute right of Congress to do anything in this plenary field that it chooses, and not inherently subject to any judicial measuring or checking as a narrow question of navigation obstruction by legal standard. Congress, as we have said, does not have to conform its actions with respect to the building, maintaining, changing or removing of structures in navigable waters to any extraneously appraisable test or standard of navigation obstruction. And no basis can exist for the courts to assume to translate what Congress has done into such a conformation and so to subject the terms

of its grant to judicial administration through the question of obstruction—which was what the court did here in considering whether the dismantling would in fact involve or would result in any obstruction to navigation, and in holding on that basis that no approval of the Secretary of War was necessary as authority for the undertaking —unless the statute contains clear indication of a legislative intent to allow such a judicial intrusion or unless a disabling ambiguity exists in it of such a nature as to compel the intrusion.

■ Here, there is neither indication nor ambiguity in the statute as a warrant for any judicial dealing with bridge modification, any more than with bridge erection, as a question of obstruction to navigation. The authorization as to the Harahan Bridge was conditioned in plain and unequivocal terms that the plans for the bridge structure had to be submitted to and approved by the Secretary of War and the Chief of Engineers, and that those plans should not be deviated from "either before or after completion of the structure," without a submission and approval of the modification in the same manner. The provision of the statute is absolute that, after any plans shall have been approved, "it shall not be lawful to deviate from such plans, either before or after completion of the structure, unless the modification of such plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War." Deviation from "any plans * * * approved," except upon the basis prescribed in the grant, constituted a violation of the statute, whether done during or done after the building of the bridge. And the significance of the prohibition as representing an absolute legislative policy is pointed up by the general power given the Secretary of War to compel the removal of any structure "erected or maintained in violation of the provisions

of this Act". 34 Stat. 86, 33 U.S.C.A. § 495.

■ The only right therefore that existed to build the Harahan Bridge and the only right that existed to change it was on the basis of the same unqualified and unequivocal condition, that there had to be a submission to and approval by the Secretary of War of the plans. Judicial visa on the question of obstruction could, as we have suggested, no more suffice as a warrant for changing the bridge structure than it would have done for erecting it. The identicalness of the language used and of the prerogative involved leaves no basis for any legal differentiation in the scope of the legislative condition between the two undertakings. And since both the terms and the field of the condition were plain and absolute, there could exist no basis for engaging in any judicial interpretation of it as to either situation. But even if there had existed any basis for reasonable debate between the parties over the meaning of the condition, the content and scope of the grant of privilege in any of its incidents would have had to be read "most strongly in favor of the grantor" and not to effect a liberalization of the privilege of the grantee. Hannibal & St. J. R. Co. v. Missouri River Packet Co., 125 U.S. 260, 271, 8 S.Ct. 874, 880, 31 L.Ed. 731; In re Binghamton Bridge, 3 Wall. 51, 75, 70 U.S. 51, 75, 18 L.Ed. 137.

Whether the requirement as to approval which the statute has thus made may have the burdensome effect of making "the Board of Engineers of the War Department act as consulting or supervising architects in matters of bridge construction", as is suggested in Freeport Texas Co. v. Houston & B. V. Ry. Co., D.C.S.D.Tex., 257 F. 213, 218, 219, affirmed sub nom. Midland Bridge Co. v. Houston & B. V. Ry. Co., 5 Cir., 268 F. 931,[2] we do not deem a matter of judicial concern. Congress has prescribed, as it

2. That case was a suit between private parties, on a contract relating to the construction of a bridge, where recovery for some of the work done was sought to be defeated on the ground, among others, that it had involved a change in plans which had not been approved by the War Department. In affirming a recovery for this work, the Circuit Court of Appeals, inter alia, said: "We also think that, even if such approval [of the Secretary of War] was necessary to legalize such change, the failure to obtain it would not affect the rights of the par-

had the right to do, that all plans for the construction and all plans for the modification of an authorized bridge under the Act of 1906 equally must be submitted to the Secretary of War for approval, and that neither of such undertakings can lawfully be engaged in except upon this basis.

Incidentally, it might be observed that it would hardly seem that the examining and approving of plans in a situation of modification could entail any greater degree of administrative burden than that involved in a situation of initial construction. But whatever the extent of the burden may be in either situation, it is not in any event within the province of the courts to try sympathetically to lighten that administrative burden by making judicial intrusion. And such an intrusion can no more properly be made to lessen the Secretary of War's task in matters of modification than in matters of initial construction. Nor, of course, is the door open to any indirect approach to the situation by presuming to declare what the Secretary of War's judgment ought reasonably to be or by undertaking to anticipate to what extent, if any, his ruling might be subject to judicial scrutiny as a question of arbitrariness. Cf. Monongahela Bridge Co. v. United States, 216 U.S. 177, 195, 30 S.Ct. 356, 54 L.Ed. 435.

And so the trial court was not entitled to dispose of the injunction request on the basis of determining whether a removal of the roadways would give rise to any obstruction of navigation but simply of inquiring whether what was going to be done would constitute a deviation from or modification of the approved plans as a bridge or structural consideration. To that question there clearly existed but one answer. Undisputably, if the Bridge Company had undertaken, after approval of the plans originally, to eliminate the roadway

projections of the bridge and to erect only the railroad superstructure, it would have been guilty of a deviation from the plans. The deviation would have been one of emphasized apparency in the present situation, from the provision of the authorizing Act that the bridge was to be constructed to "provide for an adequate and a separate roadway" in addition to "its use for railroad purposes". No less plainly, we think, would a removal of the roadway projections subsequently, with its changing of the bridge in facility and type from a combination to a railroad structure, constitute a deviation from or modification of the approved plans.

It may be assumed for present purposes that deviation or modification should be regarded as connoting something of substance and not a mere triviality. But substance here must be viewed in terms of plans of structure as such and not on the basis of attempted obstruction appraisal, since what the Secretary of War has been given authority to deal with is bridge plans in all their aspects as a broad matter of construction and modification privilege and not simply completed-structure consequence as a narrow question of navigation obstruction. Substance in deviation or modification, as a question of plan approval, therefore necessarily could involve considerations of form of design, kind of materials, type of construction, nature of facilities, etc.—the same as these elements would be entitled to be factors of consideration on any submission of plans in relation to initial erection.[3]

On this basis, the conversion of the Harahan Bridge from combination to railroad facility and type, by dismantling its roadway structures, would, as we have said, plainly constitute a deviation from or modification of the bridge plans which had

ties in this present suit." 268 F. at page 934.

3. In the matter of mere repairs, the Department of the Army, Corps of Engineers, has made practicable provision by regulation, as follows: "Repairs to a bridge which do not alter the clearances, type of structure, or any integral part of the substructure or superstructure or

navigation conditions, but which consist only in the replacement of worn or obsolete parts, may, if the bridge is a legally approved structure, be made as routine maintenance without approval of the Department of the Army." 33 CFR 1949 ed., § 209.315. The situation here, however, is not one of replacing existing parts.

been approved. And even if the bridge were not being so changed in facility and type but the intention was simply to eliminate 320 tons of steel beams, struts, stringers and cantilever arms from the plans as structure content or material, the nature and amount of what was involved would equally, we think, make the deviation or modification, on its face, one of substance, as a structural matter alone.

▮ From what we have said, the intended dismantling of the roadways would therefore constitute a taking of unauthorized local or private action in the nationally sovereign domain of navigable-waters control, for which Congress had prescribed a governing policy of privilege and prohibition. Such a violation, just as in the equally absolute field of public lands, would amount legally to an improper appropriation of private privilege in sovereign domain, to an interference with the right of exercising governmental function therein, and to a thwarting of the public policy which Congress has made applicable thereto, against which the Government is inherently entitled to seek protection through a writ of injunction. Cf. Griffin v. United States, 8 Cir., 168 F.2d 457, 459; Economy Light & Power Co. v. United States, 256 U.S. 113, 124, 41 S.Ct. 409, 65 L.Ed. 847.

The Government has made the further contention that, beyond the matter of obtaining approval from the Secretary of War for the dismantling, as a matter of deviation from or modification of the original plans, there was no right to discontinue the roadways and the approaches of the Harahan Bridge, whether through dismantling or otherwise, except with the express consent of Congress by a special act or resolution, because of the provision of the Act of 1912 that "said bridge shall be so constructed, maintained, and operated that, in addition to its use for railroad purposes, it shall provide for an adequate and a separate roadway and approaches and continuous use by the public as a highway bridge * * *."

The original Act, 37 Stat. 195, had imposed an obligation of maintenance upon the Bridge Company as to both the road-

way and its approaches, linked with a grant of the right to the Bridge Company to charge tolls. Within approximately a month's time from its passage, the Act was amended, 37 Stat. 359, to permit the Bridge Company to defer building any approaches for the roadway until it should have been paid the sum of $50,000 by local public authorities; to relieve it of its obligation thereafter to maintain the approaches; and to deprive it in that situation of the right to collect tolls for use of the approaches. By another provision, which has previously been referred to, the Bridge Company was further given the right to sell the roadway portion of the bridge (as well as the approaches) to "any county, city, improvement district, or municipality;" was relieved of the obligation to maintain the roadway in case this was done; and was consequently thereupon deprived of the related right to charge roadway tolls.

It will be noted that Congress anticipated that sooner or later the roadway situation would come to be one where local public funds would be invested and where local governmental voice and interest would therefore be involved. This was before the day of the system of federal aid or contribution in highway building. Congress seems to have patterned its prescriptions in the Act here involved to the realities of the situation which would probably exist where an investment of local public funds had been made. The amended Act imposed the obligation of maintenance upon the Bridge Company and granted the right to collect tolls, only until local governmental participation occurred. After local public funds had made their entry into the situation, the question of maintenance was not made a matter of direct obligation.

Thus, the provision in the section of the amended Act, releasing the Bridge Company from the obligation to maintain the approaches after a payment of $50,000 should have been made to it by local public authorities—such participation being permitted, so far as the language of the statute is concerned, to be made in the form of either contribution or purchase—did not purport to subject the contributor or purchaser to the duty of maintenance as a

statutory obligation. Similarly, in the separate section granting the Bridge Company the right to dispose of the roadway and approaches to a local governmental subdivision (not to another private owner), as freely by gift as by sale, with resulting release of the Bridge Company from its statutory obligation to maintain and deprivation of its right to collect tolls, there was no language making the grantee subject to any obligation of maintenance to the United States.

■ Apparently Congress was content, as a matter of encouraging the investment of local public funds, or as a matter of federal and local government relationship, or both, not to fetter a local governmental subdivision with any such direct, federal obligation but to leave the question of roadway maintenance to be dealt with, as in the case of public roads generally in that era, on the basis of local governmental responsibility and community interest. We accordingly agree with the trial court that the Act did not impose any statutory duty or obligation of maintenance upon Crittenden County, which required the consent of Congress, by act or resolution, as an absolution from a maintenance of the roadways as such. And whatever private agreement the County may have made with the Bridge Company to keep the roadway in repair, as a matter of settling relationships between themselves with respect to the condition of the bridge, would probably not, in its incidental benefits to third persons, survive a termination by the parties themselves of that obligation.[4] In any event, it could hardly furnish the basis for a paternalistic assertion by the United States, nor is any such assertion attempted to be made here.

The contention has, however, been made by the Government that, beyond the provisions of the authorizing Act of 1912, an obligation of maintaining the roadways was owed to the United States under the Federal Highway Act, 23 U.S.C.A. § 1 et seq., which would prevent their discontinuance, because

they had been improved during the period from 1926 to 1929 as a federal-aid project and had thus become part of the system of Federal Aid Highways. The trial court found as a fact that the roadways had ceased to be part of the federal-aid highway system, and the Government challenges the validity of this finding.

On the trial, the Government was permitted over objection to introduce in evidence a letter from the Secretary of Commerce to the Attorney General in 1951, which stated that "although the new bridge structure has been opened for use by traffic," the project had "not been entirely completed" and "elimination of the Harahan Bridge from the system of Federal-aid highways, therefore, would not yet be in order." The trial court viewed this letter as amounting in the circumstances of the situation to at most merely a declaration on the part of the Secretary of Commerce, and as not being determinative of the status of the roadways as part of the federal-aid highway system, because other evidence established that approval had previously been given by the Bureau of Public Roads to the removal of the roadways from the system upon conditions which had come to exist and whose existence had made that approval absolute.

The court thus refused to grant an injunction on the basis of the letter, in relation to the other evidence showing that the new bridge had been "in full use" for more than eighteen months; that, from shortly after the time the new bridge was opened, the Harahan Bridge had ceased to be in traffic use; that prior to the construction of the new bridge the States of Arkansas and Tennessee had made application to the Bureau of Public Roads to revise the system of federal-aid highways to embrace the new bridge site; that the revision had been approved by the Bureau, "retaining the Harahan Bridge on the system for use until the new bridge was completed and in operation;" and that the further declaration

4. We do not here make any consideration or intend any implication on what obligation, if any, may exist between Crittenden County and the City of Memphis on the basis of any agreements between them, which may be involved in City of Memphis v. Ingram, supra, 195 F.2d 338, as remanded to the District Court.

had been made by the Bureau that "This route over the Harahan Bridge will be retained as a temporary spur until the new bridge is completed and in use," and "It will then be dropped from the Federal Aid System." The evidence also revealed that the State of Arkansas had on this basis, after the opening of the new bridge, removed the approaches and roadways of the Harahan Bridge from its state highway system.

It is to be noted that the statute does not prescribe any formalities for the granting or expressing of the approval necessary to effect a revision in the designation of the roads constituting the federal-aid highway system. See 42 Stat. 213, 23 U.S.C.A. § 6. There thus is nothing to prevent the giving of a conditional approval to a requested revision, intended to become effective upon the occurrence of certain conditions, and the ripening of that approval into automatic absoluteness, when those conditions shall have occurred. The situation here was one which on the evidence was entitled to be treated by the trial court as being of that nature and consequence.

Approval had been given to the requested revision, to take effect when the realities of the new bridge being completed and placed in use had come to exist. Other than the mere statement in the Secretary of Commerce's letter, all the evidence showed that the new bridge had been in full and superseding operation as a highway facility for a period of more than eighteen months. Indeed, the ambiguous statement in the Secretary's letter, that "the project has not been entirely completed although the new bridge structure has been opened for use by traffic," would be capable of having reference, not to the finishing of highway facility, but rather to the winding up of financial relationship in the project, since the letter points out that the cost of the structure had been paid by the States of Arkansas and Tennessee and adds that "It is not known exactly when the whole project will be completed and final payment of the Federal share of the cost may be made." But however much the Secretary regarded the matter as an uncompleted project until the financial end of it had been wound up, the approval given to the revision was not

conditioned on that basis, for the approval to the revision remained unabsolute by its terms, only "until the new bridge is completed and in use." Equally, if the letter was intended as an official declaration or proclamation to foreclose examination of whether the new bridge had in fact come to constitute a full highway facility—despite the plan status shown by the testimony of witnesses whose qualification was directly established—it would not on that basis have any compelling significance, for the operativeness of the approval had no more been left subject to the making of a declaration or proclamation by the Secretary of Commerce, after the bridge had been "completed and in use," than it had been made subject to any other condition.

In having discussed the Government's contention that the trial court erred in holding that such an approval had been given and become absolute as prevented the Government from asserting the existence of any obligation of maintenance under the Federal Highway Act as a basis for an injunction here, we have not intended thereby to leave any implication that the duty which may rest on a State or its political subdivisions to maintain a road as a part of the federal-aid highway system, is one for which the United States has a right of injunctive enforcement.

The Federal Highway Act does not itself contain any grant of injunctive right. The original Act of July 11, 1916 contained a clause that "To maintain the roads constructed under the provisions of this Act shall be the duty of the States, or their civil subdivisions, according to the laws of the several States." 39 Stat. 358, 23 U.S.C.A. § 48. It made provision for the sanction as to this local duty or responsibility that, if such a road was not properly maintained, then approval should be refused of "any project for road construction in said State, or the civil subdivision thereof, as the fact may be, whose duty it is to maintain said road, until it has been put in a condition of proper maintenance." The present statute, which is the Act of November 9, 1921, as amended and supplemented, likewise contains a clause that "It shall be the duty of the State to maintain any highway within

its boundaries after construction under the provisions of this chapter", and similarly makes provision for the sanction of withholding federal-aid funds for further projects in the State in case such maintenance is not done. 64 Stat. 789, 23 U.S.C.A. § 15.

Whether the provision as to maintenance is thus a mere declaration of local governmental responsibility or is intended to create an obligation on the part of the States to the United States, and whether, if the duty of maintenance thus has the stature of an obligation to the United States, it also is one for which an injunctive right exists or is merely subject to the pecuniary sanction for which administrative provision has been made, are questions which are not now before us, which we leave open to consideration in an appropriate future situation, and on which we make no present intimation.

On the basis which has been initially discussed, the judgment is reversed and the cause remanded for further proceedings.