**LEVINGSTON SHIPBUILDING CO.,**
Plaintiff,

v.

**The Honorable Stephen AILES, Secretary of the Army, et al., Defendant.**

**Civ. A. No. 4915.**

United States District Court
E. D. Texas,
Beaumont Division.

March 30, 1965.

George W. Brown, Jr., Beaumont, Tex., William C. Harvin, James K. Nance, Baker, Botts, Shepherd & Coates, Houston, Tex., for plaintiff.

William Wayne Justice, U. S. Atty., Eastern District of Texas, Richard B. Hardee, Asst. U. S. Atty., Eastern District of Texas, Tyler, Tex., for defendants.

FISHER, District Judge.

This case involves the much publicized, proposed fixed span bridge which is to be constructed across the Sabine-Neches Waterway unless enjoined by court action.

The present bascule type bridge, in use for some 35 years, is considered to be inadequate for modern day use, and is extremely hazardous to navigation. Numerous vessels have collided with the present bridge and such accidents have become more frequent with the increase of waterway traffic in recent years. As the result of collisions, the present bridge has been rendered inoperative for extended periods of time, causing inconvenience, not only to navigation, but also to the vehicular traffic en route from the City of Port Arthur to a tract of land commonly called "Pleasure Island", and a highway connecting with Cameron Parish, Louisiana. The Sabine-Neches Canal is too shallow and too narrow to adequately accommodate the heavy water traffic at the present time, and unless remedied, the situation will become a greater problem in the future. The Sabine-Neches Waterway project is intended to improve the navigability of the waterway while simultaneously providing a more convenient passageway for persons and vehicles to and from the City of Port Arthur and the Island as well as Cameron Parish, Louisiana.

There is no disagreement with the ultimate goal, that is, the "deepening" and "widening" of the canal, the argument is solely about the vertical clearance of the bridge to be constructed. The type of bridge which the Federal Government seeks to build in this case, is a fixed, non-suspension bridge of reinforced concrete to have a vertical clearance of 138 feet above mean low tide.

The Plaintiff, Levingston Shipbuilding Company, seeks to have the proposed fixed span bridge declared an unlawful obstruction of the Sabine-Neches Waterway to free navigation, and thus constituting a public nuisance; alternatively, Plaintiff seeks a writ of mandamus directing the Defendants to provide adequate clearance for the navigation of said waterway and to preserve and to protect Plaintiff's established and potential use of said waterway for all purposes.

The Defendants filed a Motion to Dismiss, contending that the question of obstructing a waterway by building a bridge, is solely and exclusively within the power of Congress, and is not a subject matter over which this Court has jurisdiction; further, that Plaintiff has

no cause of action or standing in Court, and that Defendants are acting within the scope of their authority and are agents of the United States Government and that this cause of action is against the Government without its consent.

The Motion to Dismiss was carried along with the trial on the merits and the attorneys for the respective parties were given until February 12, 1965, to file briefs in support of their respective positions.

 Under the Commerce Clause of the Constitution, Article I, section 8, clause 3, Congress is given plenary power over the navigable waters of the United States and by virtue of this authority, the courts have held that Congress also has the power to authorize the construction of bridges across navigable waters. Newport and Cincinnati Bridge Co. v. United States, 105 U.S. 470, 26 L.Ed. 1143 (1881), Stockton v. Baltimore & N. Y. R. Co., C.C., 32 F. 9 (App.Dism., 140 U.S. 699, 11 S.Ct. 1028, 35 L.Ed. 603) (1887), United States v. Ingram, 203 F.2d 91 (8th Cir. 1953). Pursuant to this power, Congress enacted the River and Harbor Act of 1962 (87th Congress, 2nd Session (76 Stat. 1173), which provided in part as follows:

"TITLE I—RIVERS AND HARBORS

"Sec. 101. That the following works of improvement of rivers and harbors and other waterways for navigation, flood control, and other purposes are hereby adopted and authorized to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the respective reports hereinafter designated: Provided, That the provisions of Section 1 of the River and Harbor Act approved March 2, 1945 (Public Law

Numbered 14, Seventy-ninth Congress, first session), shall govern with respect to projects authorized in this title; and the procedures therein set forth with respect to plans, proposals, or reports for works of improvement for navigation or flood control and for irrigation and purposes incidental thereto, shall apply as if herein set forth in full:

"NAVIGATION

"Sabine-Neches Waterway, Texas: House Document Numbered 553, Eighty-seventh Congress, at an estimated cost of $20,830,000."

The specific Sabine-Neches Waterway project referred to in the River and Harbor Act of 1962, is set forth in the House Document Number 553, (Pages 14 to 55) as the recommendations of the District Engineers, in part as follows:

"The channel from Port Arthur to Beaumont to have a depth of 40 feet and a width of 400 feet. The existing double-leaf bascule highway bridge crossing the Sabine-Neches Canal at Port Arthur should be removed and replaced by one with horizontal clearance at least equal to the channel width and vertical clearance of at least 138 feet above mean low tide." (Page 53.)

These recommendations were properly approved by the Board of Engineers and the Chief of Engineers and thus became a part of the Statute.[1]

The River and Harbor Act of 1962 specifies further that Section 1 of the River and Harbor Act of 1945, 59 Stat. 10, " * * * shall govern with respect to projects authorized in this Title; and * * * shall apply as if herein set forth in full." The incorporated provisions provide that:

" * * * it is hereby declared to be the policy of the Congress * * * to preserve and protect to the fullest

---

1. The case of Anderson v. Seeman, 252 F. 2d 321, (Cir.5th, 1958) Cert. Den. 358 U.S. 820, 79 S.Ct. 32, 3 L.Ed.2d 61, establishes the rule that House and Senate

Documents referred to in authorizing acts such as the River and Harbor Act of 1962 become a part of the statute by reference.

possible extent established potential uses, for all purposes, of the waters of the Nation's rivers * * * and to limit the authorization and construction of navigation works to those in which a substantial benefit to navigation will be realized therefrom and which can be operated consistently with appropriate and economic use for the waters of such rivers by other users."

Plaintiff's theory briefly is that the said proposed fixed span bridge is both unlawful and obstructive. It is unlawful because the River and Harbor Act of 1962, with the enabling House Document Number 553, does not authorize the type of bridge which Defendants are attempting to construct, therefore, the Defendants are exceeding and acting beyond the scope of their lawful authority, and that Plaintiff is entitled to judicial relief.[2] Plaintiff argues that the Defendants are only authorized to build a bridge with *adequate* vertical clearance for navigation, and that the proposed fixed span bridge with a vertical clearance of 138 feet above mean low tide is not adequate for Plaintiff's particular use and purpose; further, Section 1 of the River and Harbor Act of 1945, which is a part of the statute under which the bridge is authorized, is not adhered to in that such action on the part of Defendants in attempting to construct the fixed span bridge with a vertical clearance of 138 feet will not preserve and protect to the fullest possible extent, established potential use for all purposes of the waters of the Nation's rivers.

The Plaintiff cites the loose and somewhat ambiguous and repetitious language used by the District Engineer in his report;[3] "* * * *adequate navigation clearance*", (Page 51); "* * * *adequate horizontal and vertical clearance for navigation*", (Page 64); in support of the argument that the Congressional authority provided by the River and Harbor Act of 1962 was for *adequate vertical clearance*, and not merely a vertical clearance of 138 feet above mean low tide. Although the report of the District Engineer is quite voluminous, repetitious and somewhat ambiguous in places, no other conclusion can be reached than that it was the recommendation of the District Engineer that a vertical clearance of 138 feet would be *adequate* for seagoing traffic. This conclusion is supported by the testimony of numerous witnesses including port captains, marine superintendents, and managers of tank fleets for all of the oil companies operating vessels in the Sabine-Neches Waterway.

The Defendants have made some effort to prove that the proposed bridge should be *adequate* for Plaintiff's use, or at least that such vertical clearance would not be too injurious to Plaintiff in the construction and repair of mobile off-shore drilling rigs in that a "topping off" procedure could be used at some point after the structure had traveled under the bridge. While such a procedure is possible, this Court has serious doubts that the process would be economically practical. Further, it might be undesirable from the customer's standpoint to have their equipment subjected to the severance process when the repairs are necessary. Also, we cannot lose sight of the further fact that the future might prove the fixed span bridge of the vertical clearance of only 138 feet inadequate for other industries which might locate in the area

2. The Supreme Court held in Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958) that the Secretary of the Army had acted improperly and in excess of his authority: "Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers."

In United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, the Supreme Court holds: "* * * the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited."

3. House Document Number 553, Pages 14–55.

and which would require vertical unobstructed access to the deep waters of the Gulf of Mexico.

This Court finds that since the Sabine-Neches Canal is the only feasible access that the Plaintiff has to the Gulf of Mexico, the minimum vertical clearance of 138 feet above mean low tide, is not adequate for the Plaintiff's use in constructing and repairing mobile offshore drilling rigs of a height in excess of 138 feet, and is therefore an obstruction to Plaintiff's established and potential use of the waterway, and Plaintiff will suffer an injury special and peculiar in kind because of its use not being protected. This Court further finds, however, that the construction of the proposed fixed span bridge with a minimum vertical clearance of 138 feet above mean low tide is not an obstruction to general seagoing traffic. Further, although said proposed bridge is obstructive of Plaintiff's use, it is not unlawful because Congress authorized this type of bridge which Defendants are attempting to construct and therefore Defendants are not acting in excess of or outside the scope of their authority. Defendants are therefore agents of the United States Government under the authority of Larson v. Domestic & Foreign Corporation, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; Ryan v. Chicago, 7 Cir., 59 F.2d 137, Hudspeth County Conservation and Reclamation District No. 112 v. Robbins, 5 Cir., 213 F.2d 425; Bryan v. West Side Calhoun County Nav. Dist., D.C., 202 F.Supp. 201.

The Plaintiff makes the further contention and argues rather ingeniously that even though the Court might hold that Congress has the power to authorize the construction of the bridge with the obstructive vertical clearance, and in that respect, the Defendants are acting as agents of the Government and not acting unlawfully, the Defendants are, none the less, acting in excess of their authority and are engaged in an unlawful act in attempting to construct said bridge and should be enjoined because there is no substantial benefit to navigation as provided in the said River and Harbor Act of 1945:

"* * * and to limit the authorization and construction of navigation works to those in which a substantial benefit to navigation will be realized therefrom and which can be operated consistently with appropriate and economic use of the waters of such rivers by other users."

There are cases holding in effect that Congress may create an obstruction which it believes to be an improvement to navigation without the intervention of court action. Sewell v. Arundel Corporation, 20 F.2d 503 (5th Cir. 1927) so holds:

"Undoubtedly an obstruction in navigable waters is a nuisance, and may be abated in a proper proceeding. However, it is well settled that Congress has complete dominion over the navigable waters of the United States, whether wholly within the boundaries of a state or otherwise, and has authority to undertake and prosecute such work as may be thought necessary to improve their navigability. This authority includes the power to obstruct, and when Congress gives consent to the creation of an obstruction to navigation, it ceases to be a nuisance and the courts are powerless to interfere."

Miller v. Mayor etc., of City of New York, 109 U.S. 385, 3 S.Ct. 228, 27 L.Ed. 971 (1883) is a case very similar in facts to those involved in this cause. The bridge was to be 135 feet in height above the East River, connecting New York and Brooklyn. Plaintiff, a warehouse lessee, appealed from dismissal of his complaint, contending special injury, since most vessels serving his business had masts exceeding 135 feet in height. Judgment was affirmed in the following language:

"The erection of the bridge at the elevation proposed was authorized by the action of both the state and federal governments. It would, therefore, when completed, be a lawful structure. If, as now completed it

obstructs, in any respect, the navigation of the river, it does so merely to an extent permitted by the only authorities which could act upon the subject. And the injury then apprehended, and alleged by the plaintiff and now sustained, is only such as is common to all persons engaged in commerce on the river, and doing business on its banks, and therefore not the subject of judicial cognizance."

■ In the case of Pacific Inter-club Yacht Association v. Morris, 197 F.Supp. 218 (N.D.Calif.1960) Affd., 228 F.2d 886 (9th Cir. 1961), a group of yachtsmen sought to enjoin construction of a draw bridge which would remain open when not in use and judgment was entered in Defendant's favor holding that Congress had established the Army as the final arbitrator in bridge location and construction over navigable waters. The emphasis in these cases seems to be on the question of navigation. Congress definitely has plenary power over matters of navigation, and if navigation is the issue where a bridge is involved, Congress has the final say without court intervention. It is difficult to conceive of an obstruction authorized by Congress involving a bridge, which Congress would not also consider a benefit to or improvement to navigation.

Notwithstanding the above authorities, this Court believes that such questions are matters of judicial determination. In United States v. Gerlach Live Stock Company, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1949), the Supreme Court observed that:

" * * * this Court has never permitted the Government to pervert its navigation servitude into a right to destroy riparian's interests * * * where no navigation purpose existed.

\* \* \* \* \* \*

"Accordingly, we need not decide whether a general declaration of navigation purpose is controlling where interference with navigation is neither the means * * * nor the consequence * * * of its advancement elsewhere. Similarly, we need not ponder whether, by virtue of a highly fictional navigation purpose, the Government could destroy the flow of the navigable stream * * *. We have never held that or anything like it * *."

■■ The Defendants' authority to construct said proposed bridge will accordingly be determined by the test of whether the obstruction will be an aid to, benefit, or improvement to the navigability of the Sabine-Neches Waterway. Plaintiff argues that "if the present obstructive bridge is removed, and the channel is deepened and widened, navigation of the canal will be completely free and unobstructed. Therefore, the construction of a bridge in any form will not be said to benefit the navigability of the canal." This is not the test of improvement or benefit to navigation. The present bascule bridge with its record of numerous collisions, because of inadequate horizontal clearance has been in use for many years for vehicular traffic going to and from the City of Port Arthur. Congress has authorized a proposed fixed span bridge to replace the present bridge so there is no choice of a bridge or no bridge or some other type of bridge more acceptable to the Plaintiff. The question, therefore, for this Court to decide is whether the new fixed span bridge with vertical clearance of 138 feet above mean low tide with a horizontal clearance of 400 feet is an improvement, aid or benefit to navigation of the Sabine-Neches Waterway as compared to the present bascule type structure. This Court must hold that undoubtedly the proposed fixed span bridge would be an improvement and benefit to navigation, disregarding the obvious benefit resulting to commerce from the use to be made of said proposed bridge by persons and vehicles traveling to and from the City of Port Arthur. Many witnesses have so testified at the hearing, and Congress in authorizing the project so stated.

Many cases support Congress's broad power over the navigable waters in which an obstruction to navigation has been created by the construction of a bridge where there was also found to be a consequential benefit or improvement to navigation, U. S. v. Commodore Park, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945); U. S. v. Willow River Company, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101; Port of Seattle v. Oregon Railway, 255 U.S. 56, 41 S.Ct. 237, 65 L.Ed. 500 (1921).

The remaining point on which *Plaintiff relies for injunctive relief* against the proposed obstructive bridge is that Defendants are proceeding in violation of the conditions of local participation; the provision being:

"To hold and save the United States free from damages resulting from the project."

The Plaintiff says that such condition cannot be legally met, because the Constitution of Texas prohibits cities and counties from creating such a pecuniary obligation.[4] This Court concedes that certain financial obligations incurred by a commissioner's court of a county have been held to be unenforceable.[5] However, I do not believe such court decisions are determinative of this controversy— in other words, is the unenforceable provisions "to hold harmless" a condition precedent of which Plaintiff might seize upon for relief by way of injunction. I do not think so. The Chief of Engineers concurred in the recommendations of the District Engineer for the replacement of an obstructive bridge at Port Arthur, providing that prior to construction, local interests agree among other things to "hold and save the United States free from damages resulting from the project."

The State of Texas, through its Governor, concurs in the findings and conclusions of the Texas Water Commissioner:

"* * * that said project is feasible and that the public interest will be served thereby."

The Commissioners' Court of Jefferson County passed a resolution agreeing to comply with all conditions specified by the Board of Engineers relative to local participation, and one of the conditions being to "hold and save the United States free from damages resulting from the project." It appears, therefore, that the State of Texas and the County of Jefferson have complied with all conditions required by the Defendants acting for the United States Government.

Congress left it to the discretion of the Defendants in the first instance to specify the conditions of local participation; and certainly the Defendants, having this authority, would be the proper persons to determine whether or not the local participation had been satisfied. If the Defendants are satisfied with the resolutions passed and adopted by the Commissioner's Court of Jefferson County and the State of Texas, does the Plaintiff have the right to complain? I do not think so.

The Defendants' Motion to Dismiss is sustained, and judgment will accordingly be entered for the Defendants.

The Court will make additional findings of fact and conclusions of law not inconsistent with this opinion upon request of either party.

---

4. Article 11, Constitution of Texas, Vernon's Ann.St.; Texas & N. O. Rwy. Co. v. County of Galveston, 141 Tex. 34, 169 S.W.2d 713, which held that a hold harmless contract executed by county was null and void.

5. Hardin County v. Trunkline Gas Company, 5 Cir., 330 F.2d 789, holding that Hardin County could not legally pay a debt which the Commissioner's Court obligated itself to pay to Trunkline for expenses in connection with lowering a gas line because of the prohibition found in the Constitution of Texas, Article 3, Section 53.